Commonwealth *v.* Brown, Appellant.

192

Argued November 20, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Nicholas S. Kladitis,* Assistant Public Defender, for appellant.

*Robert F. Banks,* First Assistant District Attorney, with him *Joseph J. Nelson,* District Attorney, for Commonwealth, appellee.

OPINION BY HOFFMAN, J., March 29, 1976:

Appellant, a parolee at the time of his arrest, contends that his arrest and the search of his home were illegal because they were effectuated without a warrant.[1] The Commonwealth concedes that a parolee is entitled to some Fourth Amendment protections, but argues that he should not be entitled to the protection afforded by a warrant. Thus, we must decide the extent of a parolee's Fourth Amendment protection, a question of first impression in Pennsylvania.

---

1. Appellant raises four additional contentions in his brief. Due to our disposition of his first claim, however, we do not reach the merits of those contentions.

On January 17, 1975, appellant was arrested in connection with a November 3 or 4, 1974 burglary of Grafo Colloids Corporation, located in Sharon, Mercer County. Appellant moved to suppress the evidence seized during a search of his home conducted at the time of his arrest. On April 8, 1975, the lower court denied that motion. On April 24, 1975, the appellant was convicted of burglary and theft and sentenced to a term of imprisonment of 5 to 10 years. This appeal followed.

The operative facts were set forth by the court in its opinion accompanying the order denying the motion to suppress: In November, 1974, Richard Carr, Superintendent of Manufacturing of Grafo Colloids Corporation, reported a burglary that occurred between 10:30 a.m., on November 3, and 8:00 a.m., on November 4. The proceeds of the burglary included a television set, a stereo receiver, speakers, and stereo tapes.

Appellant, a parolee, was an employee of Grafo Colloids from September 30, 1974, to January 17, 1975. Clyde Little, an agent of the Board of Probation and Parole, had been assigned to supervise the appellant. Under appellant's parole contract, he was subject to close supervision. Agent Little was to see appellant at least twice a month, but was empowered to visit him at home whenever the agent believed necessary.

In early January, 1975, a counselor at a local community treatment center told the parole agent that appellant had the stolen goods in his home. During his next visit, the agent saw a television set and a stereo system. After he received a specific description of the stolen items from a Grafo Colloids' employee, the agent informed Mr. Carr that he believed that appellant had committed the burglary. Mr. Carr advised the agent that he wanted police to take action against appellant.

On January 17, 1975, the agent, Mr. Carr, and two Sharon police officers went to appellant's home. Apparently, the agent asked the police officers to accom-

pany him to assist in arresting the appellant. A woman admitted the four men into the apartment. At that time, the parole agent advised the appellant of the purpose for the visit. Mr. Carr immediately identified the stereo and television set. Appellant denied that the items were Carr's and stated that he had purchased them "downtown." Thereafter, the agent arrested appellant. The parole agent effected the search and arrest without a warrant.

During this century, legislatures and courts have increasingly used parole to relieve overcrowding of limited prison facilities and to effectuate prevailing theories of rehabilitation. See Comment, The Parole System, 120 U. Pa.L.Rev. 282 (1971); Note, The Parole Revocation in the Federal System, 56 Geo.L.J. 705 (1968); Note, Parole: A Critique of Its Legal Foundations and Conditions, 38 N.Y.U.L.Rev. 702, 705-707 (1963). As stated by the United States Supreme Court in *Morrissey v. Brewer*, 408 U.S. 471, 478 (1972), "[t]he essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." Because parolees are still subject to an extant term of imprisonment and are the focus of society's rehabilitative efforts, they are treated differently from the general population. *Morrissey v. Brewer*, supra.[2] Most importantly, parolees "are subjected to specified conditions for the

---

2. See also, Comment, The Parole System, supra at 284-85: "Parole provides a presently existing program through which prisoners may be removed from that environment and, hopefully, successfully reintegrated into society. The parole system seeks to achieve the rehabilitation of the parolee and his reintegration into society by the time of the termination of his parole. Reintegration and rehabilitation are pursued within general constraints imposed by a duty to protect the public from any potential criminal behavior by the parolee. To achieve these ends, many limitations, termed conditions, are imposed on the parolee, and compliance with such conditions is ensured through continuing supervision by parole officers."

duration of their terms. These conditions restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen." 408 U.S. at 479.

In Pennsylvania, the Board of Parole[3] is charged with the responsibility "to make general rules for the conduct and supervision of persons heretofore or hereafter placed upon parole." 61 P.S. §331.23.[4] Conditions established by the Board include, for example, the responsibility to report to a parole agent, to live in a specified residence, to seek permission of the agent before moving or temporarily leaving the jurisdiction, to avoid "undesirable" companions and incurring substantial indebtedness and to seek employment. 37 Pa. Code §63.4.

Undoubtedly, our legal system can tolerate the diminished legal status of parolees — that is, no court has held that a parolee is entitled to the full panoply of individual rights and liberties. Cf., *Mempa v. Rhay*, 389 U.S. 128 (1967). Recent court decisions have been unanimous, however, in holding that a parolee or probationer must be afforded due process. See, e.g., *Morrissey; Gagnon v. Scarpelli*, 411 U.S. 778 (1973); *Commonwealth v. Davis*, 234 Pa. Superior Ct. 31, 336 A.2d 616 (1975). To so hold is only the beginning of judicial inquiry. As stated in *Morrissey*, supra at 482, "[o]nce it is determined that due process applies, the question remains what process is due."

The approach applied by the Supreme Court in *Morrissey* was the employment of a balancing test.[5] On one hand, "[w]hether any procedural protections are due depends on the extent to which an individual will 'be condemned to suffer a grievous loss.' " Id. The parolee

---

3. See Act of May 1, 1929, P.L. 1184, §1 et seq.; 71 P.S. §841 et seq.

4. Act of August 6, 1941, P.L. 861, §23.

5. See also, Comment, The Parole System, supra at 296-300.

has a strong interest in continued liberty and in the possibility of resuming a normal life, one hopes, as a productive citizen. Some commentators have suggested that the myriad conditions imposed by parole boards are demeaning to the parolee and counterproductive to rehabilitative goals. See Comment, The Parole System, *supra*. On the other hand, "[t]urning to the question what process is due, we find that the State's interests are several. The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty. Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts." *Morrissey*, supra at 484. This risk provides the justification for some curtailment of a parolee's liberty.

Further, we must consider a second interest of society — that is, whether administrative efficiency excuses its non-compliance with the warrant requirements of the Fourth Amendment.[6] The parole agent is a necessary adjunct to the parole system. "... [T]he parole officer ordinarily does not take steps to have parole revoked unless he thinks that the violations are serious and continuing so as to indicate that the parolee is not adjusting properly and cannot be counted on to avoid antisocial activity. The broad discretion accorded the parole officer is also inherent in some of the quite vague conditions ...." *Morrissey*, supra at 480. Such broad discretion is viewed as an administrative necessity.

---

6. Both parties cite 61 P.S. §331.27: "Parole officers appointed by the board are hereby declared to be peace officers and are hereby given police power and authority throughout the Commonwealth to arrest without warrant, writ, rule or process any parolee or probationer under the supervision of the board for failing to report as required by the terms of his probation or parole, or for any other violation thereof." The Commonwealth, however, does not contend that the statute is dispositive of the instant case. Rather, the Commonwealth recognizes that we must decide the Fourth Amendment issue.

The specific problem has been addressed by other courts. There is, however, a division of authority on the degree of Fourth Amendment protection due to parolees. See, e.g., *Brown v. Kearney*, 355 F.2d 199 (5th Cir. 1966) (dictum); *United States v. Lewis*, 274 F. Supp. 184 (S.D.N.Y. 1967) (granting extensive protection); cf., *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975); *People v. Thompson*, 252 Cal. App. 2d 76, 60 Cal. Rptr. 203 (1967), *cert. denied*, 392 U.S. 930 (1968); *People v. Hernandez*, 229 Cal. App. 2d 143, 40 Cal. Rptr. 100 (1964), *cert. denied*, 381 U.S. 953 (1965).

The basis for holding that a parolee has diminished Fourth Amendment rights is the necessity for an agent to have free access to supervise the parolee. Cf. *Wyman v. James*, 400 U.S. 309 (1971); *Camara v. Municipal Court*, 387 U.S. 523 (1967). Society has an interest — both for its protection and to effectuate rehabilitation — in facilitating such supervision. We, therefore, agree that when performing his normal duties, a parole agent is not required to obtain a search warrant.[7] We are, however, cognizant of another distinction cited in relevant case law: once a parole agent involves the police in the search and arrest of a parolee, upholding the search permits the police to circumvent the warrant requirement in what in reality is the normal function of the police. See, *People v. Coffman*, 2 Cal. App. 3d 681, 82 Cal. Rptr. 782 (1969); cf., *People v. Thompson*, supra. As stated in *Coffman*, supra at 688, 82 Cal. Rptr. at 786: "The parole agent's physical presence, even his nominal conduct of the physical acts of search, does not signalize validity. The purpose of the search, not the physical presence of a parole agent, is the vital element." That is, once the rationale that justifies informal treatment of parolees ceases, the parolee's

---

7. Thus, 61 P.S. §331.27, note 6 supra, has continuing validity in so far as it applies to a parole agent's administrative function.

Fourth Amendment rights must be given full considera-
tion.

The facts of the case underscore the infirmity of
allowing the parole agent to ignore the warrant
requirement. When the agent discovered the proceeds of
the burglary on his initial visit to appellant's residence,
he had ample basis to acquire a warrant. The Com-
monwealth cannot argue that the agent was acting to
preserve evanescent evidence because the agent delayed
in effectuating the arrest. He requested the assistance of
the police, and thereby, relied fully on the police power
to arrest. Stated differently, the parole agent ceased
acting as an administrator of the parole system. He was
not collecting evidence in order to have appellant's parole
revoked. Rather, he was acting as a police officer,
involving a witness who wanted to press criminal
charges and other police officers. Once he "switched
hats" and, in all relevant respects, became a police
officer, the administrative justification that generally
permitted him to avoid acquisition of a warrant was no
longer applicable. Thus, the Constitution mandated that
he obtain a search warrant for appellant's premises.

Therefore, because the lower court erred in denying
appellant's motion to suppress, we reverse and remand
for a new trial.

DISSENTING OPINION BY PRICE, J.:

This interesting case of first impression in this
Commonwealth is properly developed factually and, to a
large extent, legally by the Majority. I agree with the
Majority that a parole agent is not required to obtain a
search warrant when he is performing his normal duties.
I must dissent, however, for this parole agent was well
within the purview of his normal duties under the facts
before us.

The performance of a parole officer's duties requires
him to know as much about the parolee as it is humanly
possible to know. The court in *Latta v. Fitzharris*, 521

F.2d 246, 250 (9th Cir. 1975), has observed: "The parole officer ought to know more about the parolee than anyone else but his family." Because of the duties imposed, the rehabilitative purposes of the parole system and the obligation of the parole system to protect the public, the parole officer must be given a unique right and interest in invading the privacy of the parolees to be supervised.

The appellant, on the other hand, as a parolee, does have a personal privacy interest, even against his parole officer. It is in the balancing of these interests that I disagree with the majority.

Because of the parolee's unique position, amply demonstrated by the majority opinion, his privacy interest is subject to certain justifiable restrictions.

Such a restriction appears in this appeal. Appellant is in a different position than that of an ordinary citizen in that he is still serving a sentence, albeit parole, and is still under the control of the conditions of that sentence through the terms of his parole. The parole officer, as an agent of the Pennsylvania Board of Probation and Parole, is the person entrusted with the supervision and enforcement of these terms. In that sense the parole officer is a law enforcement officer. This is recognized in Section 27 of the Act of August 6, 1941, P.L. 861 (61 P.S. §331.27), and is necessary to deter a parolee from returning to a life of crime.

A parole officer's normal duties then must include the preventing of possible further criminal conduct on the part of the parolee. To discharge these duties, some type of search must be permitted, without warrant, to determine, among other valid purposes, whether the parolee is using his home as a repository for stolen property. Therefore, one of the restrictions imposed upon a parolee is that he and his home are subject to search, without warrant, when the parole officer has any cause to suspect the parolee of being involved in further criminal conduct.

In this context it is important to note that a parole agent must of necessity make many visitations with those under his supervision. These, to be effective, must for the most part be unannounced and frequent. Thus in the most unexpected and unusual ways may a parole agent come upon evidence of continuing or new criminal activities by those under his supervision. It is unrealistic to impose on one in this unusual situation the standard of probable cause embodied in the principles applicable to ordinary searches. Nor is it appropriate to establish a guideline, whether it be called the "hunch" or "founded suspicion" principle, to apply in such searches. The situation requires that the law dispense with the warrant requirement, otherwise a frustration would develop between the law and the purposes of the parole system. The Pennsylvania legislature has recognized this need by promulgating the Act of August 6, 1941, P.L. 861, §27 (61 P.S. §331.27), which clearly reflects the adoption of the choice to dispense with the warrant requirement altogether in dealing with the parole officer—parolee relationship.

Under the facts of this case it is clear that on January 10, 1975, when the parole agent visited the appellant there was no specific knowledge on the part of the agent that the television, stereo receiver and speakers observed in the appellant's home were, in fact, related to the burglary involved in this conviction. At that point in time the agent was armed only with information from a counselor at a local community center that appellant had possession of some stolen goods involved in the theft. It was not until January 17, 1975, the date of the arrest, that the goods were definitely identified as those involved in the theft. When that definite link was established the arrest occurred. The majority characterizes this action as a delay. However, until this important link was established, the agent was not satisfied that his information justified an arrest of appellant. Such a decision on his part was certainly justified and well within the discre-

tion properly to be accorded a parole agent in the performance of his duties. This cannot be so narrowly construed so as to justify a holding, as the majority does, that the agent had ceased acting as an administrator of the parole system and had switched hats to become a police officer. The parole agent is at all times a peace officer invested with police power as conferred by the Act of August 6, 1941, P.L. 861, §27 (61 P.S. §331.27), thus he always wears that hat. Quite obviously there is no hat to switch. It has often been said, with good reason, that, although a peace officer, a good parole agent does not regard himself as a policeman. To so classify him is a disservice which would directly reduce his effectiveness in the discharge of his duties and responsibilities.

The majority attaches great significance also to the presence, during the search and arrest on January 17, 1975, of two Sharon police officers. The record makes clear, and the lower court specifically found, that the purpose of their presence, at the express wish of the parole agent, was to lend the agent assistance in effecting the arrest in the event assistance was needed. Fortunately such aid and assistance was not needed and the agent effected the arrest without difficulty. The agent, however, was entitled to the thought of personal safety and protection under such circumstances and the back-up of the two police officers may well have been a factor in the peaceful accomplishment of the confirmation that the goods involved were indeed the stolen goods and in effecting the arrest. There is absolutely nothing in this record, or in the conclusions of the lower court, to suggest that the parole agent was the stalking horse for the police. To the contrary, it seems clearly established that the police were present to render assistance to the agent should it have become necessary. The police were passive actors in the critical events surrounding this search and arrest. There is no evidence that the police initiated this action in any way.

Thus, I can find no justification for mandating the

requirement of a search warrant, and would affirm the judgment of sentence.

It is perfectly possible that the case would arise where the action involved would be so unreasonable under the parole system as to violate the Fourth Amendment. We could not, and would not, condone a course of conduct that would establish harassment or intimidation. A course of conduct establishing such would be violative of the spirit of the parole system and would infringe upon that area of privacy to which a parolee is entitled. It is clear, therefore, that parole agents, under the guise of the responsibility of their duties, may not conduct searches of parolees' homes whenever and as often as they feel like it. The facts here presented, however, clearly establish that the search was consistent with, and included within, the ambit of the parole agent's duties and responsibilities. It was certainly not oppressive or harassing. There is, therefore, no reason to impose the requirement of a warrant.

I would affirm the judgment of sentence.

JACOBS and VAN DER VOORT, JJ., join in this dissenting opinion.