591 A.2d 1079

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Michael GREEN, Appellee.**

Superior Court of Pennsylvania.

Argued March 6, 1991.

Filed May 29, 1991.

Kathy L. Echternach, Asst. Dist. Atty., Philadelphia, for Com., appellant.

Samuel C. Stretton, West Chester, for appellee.

Before BECK, POPOVICH and HOFFMAN, JJ.

POPOVICH, Judge.

This case involves an appeal by the Commonwealth from the order of the Court of Common Pleas of Philadelphia County granting the Defendant/Appellee's (Michael Green's) motion to suppress.[1] We reverse.

The standard of review in such a case has been articulated most recently by a panel of this Court in *Commonwealth v. Jenkins*, 401 Pa.Super. 580, 585 A.2d 1078 (1991); to-wit:

> In reviewing a suppression court's order suppressing evidence, we, as an appellate court, must consider only the evidence of the defendant's witnesses, and only so much of the evidence presented by the prosecution as remains uncontradicted by the record as a whole. When the evidence supports the factual findings of the suppression court, we may reverse only if there is an error of law.

*Id.* 401 Pa.Superior Ct. at 581, 585 A.2d at 1079 (Citations omitted). Instantly, the Defendant/Appellee presented no witnesses. Accordingly, the Commonwealth's factual account remains uncontradicted in the record. With the preceding in mind, we proceed to itemize the facts needed to assess the propriety of the suppression court's ruling.

On December 19, 1988, Pennsylvania State Parole Officer James R. Hines was assigned to supervise the Defendant, a parolee as of March 15, 1988, while he received treatment at the intensive drug unit in West Philadelphia. The Defendant had secured a job driving a school bus and was earning from $150 to $200 a week.

---

1. Inasmuch as the Commonwealth certified in its appellate brief that the suppression court's order effectively terminated its case against the Defendant, this appeal is properly before the Superior Court. *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985).

Six or seven weeks prior to February 22, 1989, Parole Officer Hines received an anonymous phone call indicating that the Defendant might have been involved in drug trafficking. After receipt of this information, Parole Officer Hines spoke with his supervisor and other fellow parole officers. It was concluded that a surveillance of the Defendant was warranted. In the course thereof, it was discovered that the Defendant was driving a Cadillac and making efforts to conceal this from the parole office. For instance, the Defendant would park the Cadillac one to two blocks from the parole office where he would visit at least twice a week, even though there was parking available at the office site. Also, it was noticed that the Defendant was in possession of what appeared to be expensive jewelry, items which were beyond his visible means to afford.

On February 21, 1989, at 10:25 p.m., Parole Officer Hines arrived at the Defendant's residence and was told by his mother that her son was not there. Under the terms of the Defendant's parole, he was required to be home between the hours of 8:00 p.m. and 6:00 a.m. As a matter of procedure, Hines had to inspect the Defendant's room to verify his unauthorized absence, a clear violation of condition # 7 of his parole and a ground upon which to terminate the program. Defendant's mother was advised of the parole officer's need to see Green upon his return.

On February 22, 1989, at approximately 11:30 a.m., the Defendant came into the parole office voluntarily. With his arrival, the Defendant was arrested, handcuffed and shackled before being transported a distance of some ten blocks to his home for a search of his room.

The search was prompted by the Defendant's violation of his curfew the preceding evening and Parole Officer Hines' notification by letter dated February 6, 1989, that the Defendant had been terminated from the West Philadelphia drug treatment program, either of which constituted a basis to revoke parole.

Parole Officer Hines and three other agents from the office conducted a search of the Defendant's room and

found: (1) a .32 caliber revolver with 12 rounds in a jacket; (2) 29 grams of what was believed to be a controlled substance (cocaine); and (3) a suitcase with drug paraphernalia, *i.e.*, an Ohaas 3 beam balance scale, large jars identified as Manatol, a large jar marked Quinine, some items with residue, and 4–5 hundred unused packets.

Thereafter, the Defendant was given a copy of Form 340 specifying the reasons for the detainer of February 22, 1989, which included the charges lodged against him arising out of the search.

The confiscated drugs were turned over to the Philadelphia Police Department for testing and resulted in the filing of charges, *i.e.*, possession of drug paraphernalia, possession of a controlled substance, and possession with intent to deliver a controlled substance. However, the seized .32 caliber revolver, albeit given to the police by the parole officer, did not lead to the filing of any offense.

A motion to suppress was filed, testimony was received and arguments from counsel were heard. By order dated October 26, 1989, the suppression court concluded as a matter of law that the parolee's Fourth Amendment rights were violated and granted his motion to suppress the physical evidence. It did so in the belief that the parole officer did not have "reasonable grounds" to engage in a warrantless search, had "switched hats" (from the role of a parole officer to that of a police officer) when surveillance of the Defendant for drug trafficking was authorized and in conducting a second search of his room for contraband.

The suppression court concluded that the parole officer was looking for evidence of "new criminal charges" in searching the parolee's room following his arrest, and, as such, was required to satisfy the probable cause standard to validate the warrantless search. The Commonwealth disagreed and appealed.

The Commonwealth assails the October 26th order on dual grounds which, when distilled, are reduced to the claim that the parole officer had "reasonable grounds" to conduct

the search of the parolee's room following his arrest for violating parole.

We observe that no court has held that a parolee is entitled to the full panoply of individual rights and liberties. Cf. *Mempa v. Rhay*, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967); *Latta v. Fitzharris*, 521 F.2d 246, 248 (9th Cir.1975), cert. denied, 423 U.S. 897, 96 S.Ct. 200, 46 L.Ed.2d 130 (1975); White, *The Fourth Amendment Rights of Parolees and Probationers*, 21 U.Pitts.L.Rev. 167, 172–76 (1969). However, the United States Supreme Court has acknowledged that the requirements of due process in general apply to a parolee; viz.:

> ... the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee.... [T]he liberty is valuable and must be seen as within the protection of the Fourth Amendment.

*Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972). Thus, the "minimum" requirements of due process were held by the *Morrissey* Court to require the implementation of a two-step process prior to the revocation of one's parole.

In *Griffin v. Wisconsin*, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987), the high Court was asked to decide whether a warrantless search of a probationer's home by a probation officer violated the Fourth Amendment. The factual account indicated that the Wisconsin Department of Health and Social Services, the agency delegated with the authority to supervise probationers, had regulations permitting any probation officer to search a probationer's home without a warrant as long as there were, inter alia, "reasonable grounds" to believe the presence of contraband. A variety of factors came into play in determining whether "reasonable grounds" existed, some of which included the officer's own experience with the probationer, and the "need to verify compliance with rules of supervision and state and federal law." *Id.* at 871, 107 S.Ct. at 3167.

Additionally, evidence existed that the supervisor of Griffin's probation officer received information from the police that "there were or might be guns" in Griffin's apartment. The supervisor, accompanied by another probation officer and three policemen, went to the location and conducted a warrantless search that produced a handgun. Griffin, who was present in the apartment, was charged and later convicted of a weapon's offense. His efforts to suppress proved fruitless.

The United States Supreme Court found no Fourth Amendment violation because the search was carried out pursuant to a regulation of the Wisconsin Department of Health and Social Services that itself satisfied the Fourth Amendment's reasonableness requirement. The Court found it unnecessary to embrace the State Court's position (deemed a new principle of law) that any search of a probationer's home by a probation officer satisfied the Fourth Amendment as long as the information possessed by the officer satisfied a federal "reasonable grounds" standard.

Instantly, albeit we have no proof of a "written" policy emanating from the parole office in Philadelphia, we have ample evidence of a "pattern and practice" of conducting a follow-up search of a parolee's premises upon his arrest where "reasonable grounds" exist to believe additional violations of parole may be uncovered so as to bring this case within the ambit of *Griffin,* supra. Cf. *Jarvis El v. Pandolfo,* 701 F.Supp. 98, 101 (E.D.Pa.1988) (*Griffin* applicable to assess the warrantless search of a parolee's residence and the seizure of evidence therefrom).

We find instructive the analysis engaged in by *Griffin* to dispense with the use of a "probable cause" standard in evaluating a warrantless search in a probation context, *which we find germane to a parole setting;* to-wit:

A warrant requirement would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires. More-

over, the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct, and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create....

\* \* \* \* \* \*

We think that the probation regime would also be unduly disrupted by a requirement of probable cause. To take the facts of the present case, it is most unlikely that the unauthenticated tip of a police officer—bearing, as far as the record shows, no indication whether its basis was firsthand knowledge or, if not, whether the firsthand source was reliable, and merely stating that Griffin "had or might have" guns in his residence, not that he certainly had them—would meet the ordinary requirement of probable cause. But this is different from the ordinary case in two related respects: First, even more than the requirement of a warrant, a probable-cause requirement would reduce the deterrent effect of the supervisory arrangement. *The probationer would be assured that so long as his illegal (and perhaps socially dangerous) activities were sufficiently concealed as to give rise to no more than reasonable suspicion, they would go undetected and uncorrected.* The second difference is well reflected in the regulation specifying what is to be considered "[i]n deciding whether there are reasonable grounds to believe ... a client's living quarters or property contain contraband,".... The factors include not only the usual elements that a police officer or magistrate would consider, such as the detail and consistency of the information suggesting the presence of contraband and the reliability and motivation to dissemble of [sic] the informant, ..., but also "[i]nformation provided by the client which is relevant to whether the client possesses contraband," and "[t]he experience of a staff member with that client or in a similar circumstance." \* \* \* [6]

*In such circumstances it is both unrealistic and destructive of the whole object of the continuing proba-*

*tion relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases—especially those involving drugs or illegal weapons—the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character and circumstances.*

To allow adequate play for such facts, we think it reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support the probationer search. The same conclusion is suggested by the fact that the police may be unwilling to disclose their confidential sources to probation personnel. For the same reason, and also because it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law, *we think it enough if the information provided indicates, as it did here, only the likelihood ("had or might have guns") of facts justifying the search.*

---

6. It is irrelevant whether the probation authorities relied upon peculiar knowledge which they possessed of petitioner in deciding to conduct the present search. Our discussion pertains to the reasons generally supporting the proposition that the search decision should be left to the expertise of probation authorities rather than a magistrate, and should be supportable by a lesser quantum of concrete evidence justifying suspicion than would be required to establish probable cause. That those reasons may not obtain in a particular case is of no consequence.

483 U.S. at 876, 878–80, 107 S.Ct. at 3170, 3171–72 (Emphasis added; footnotes omitted; citations omitted).

At bar, we had testimony from Parole Officer Hines that the search of the Defendant's bedroom, following his arrest, was "part of . . . normal procedure" for the narcotics unit in

West Philadelphia. Municipal Court Hearing, 3/15/89 at 5 & 9. This "standard procedure" was activated:

> ... if the man [wa]s being ... arrested, taken into custody ... [even if this took place at the parole agent's office] it [wa]s ... procedure to check his residence....

Id. at 10–11. As an example of how the procedure is implemented, Officer Hines recounted that where a parolee had been known to "carry weapons", upon his arrest the parole officer would conduct a search of the immediate area in which he was taken into custody, and possibly his room would be searched for weapons.

> The same situation [existed] with drugs. If we received information that he may be involved with drugs, either using or selling drugs, and we go to the residence, or if we take him into custody in the office, we will take him to that residence and search. If it is a family dwelling, he only has one room, that's the only room that's searched. The house is not searched, only his area.

Suppression Hearing, 7/20/89 at 50. This "[wa]s the policy in the intensive drug unit at 52nd and Westminister" in Philadelphia. Id. As to whether it was a written or unwritten policy of the unit, Hines did not know. Id at 53.

With regard to the information possessed by Parole Officer Hines at the time of the Defendant's arrest, which had been accumulated over a period of six to seven weeks prior to the search, he testified:

> We had an anonymous call [that the Defendant "may" have been involved in drug trafficking]; we had surveillance on [the Defendant] which revealed a late, relatively late model Cadillac which he attempted to conceal from us and some possessions [of what appeared to be jewelry] which we felt that he may not be able to afford with his visible income. * * * And the fact that he was on parole, still under the supervision of the State Parole Board, in State custody and had a drug history.

Id. at 14 and 46. Finally, the parole officer admitted looking at an extract of the Defendant's prior arrests, which included convictions for "knowingly and intentionally

possessing" and prior drug sales. Suppression Hearing, 9/28/89 at 3.

With the preceding information in hand, and given the standard practice of searching a parolee's premises for drugs where the facts known to the officer indicated past and/or present involvement with drugs, Parole Officer Hines' purpose in searching the Defendant's room, after arresting him for violating his parole, was to secure *additional* evidence of parole violations. This was testified to consistently by Hines, especially on his cross-examination by counsel for the Defendant; namely:

Q. ... you did not search this primarily for your violation; you searched it primarily to give information to the police and, in fact, you did that?

A. Absolutely not. That's not why we searched. We searched to get any illegal contraband from the house. If that did not happen to be new police charges, fine, it still might be a parole charge. That's why we went there.

Id. at 56. All drugs were taken to the Philadelphia Police Department. All confiscated drugs are removed routinely to the police department because the parole office does not have the facilities to do the testing. Id.

We find that Parole Officer Hines, in compliance with accepted office practice and procedure, *when coupled with the information gathered upon the Defendant,* conducted a lawful warrantless search of the Defendant's room following his arrest for curfew and drug treatment violations.

The information possessed by the parole officer did not rise to the level of probable cause to justify the issuance of a warrant to search: an anonymous tip that the Defendant "may" have been dealing in drugs, his wearing of jewelry, driving a Cadillac and past drug arrests. See *Griffin,* supra; *Latta,* supra.

Nonetheless, we do not find that the Fourth Amendment required that Hines had to secure a warrant in advance of

searching the Defendant's room. When the Defendant was arrested, his parole officer was in the possession of information which, albeit not of the probable cause type to justify the issuance of a warrant to search, required him to determine whether Green was a good parole risk. In this scenario, it was critical for the parole authorities to know whether the Defendant was a regular user of marijuana or other drugs, which, in fact, had been monitored by regular urinalysis indicating negative results, *or whether he was engaged in distribution.*

" 'Possession of narcotics for sale by a parolee threatens both the parole system and the public since such activity is both a violation of parole and a separate crime.' " *Latta,* supra, 521 F.2d at 252 (Citation omitted). Consequently, applying the principles enumerated by the Court in *Griffin,* supra, we conclude that the search of Green's room was not unreasonable in a constitutional sense. As observed by the Ninth Circuit Court of Appeals in a similar situation:

> His parole officer's interest in inspecting his place of residence did not terminate upon his arrest; if anything, it intensified. Revocation is not a necessary consequence of a parole violation; frequently the parolee merely receives counseling and is released under the same or additional conditions. In making their decisions regarding disposition, the parole authorities need to know the number and seriousness of all violations, as well as other current information about the parolee's progress.

*Latta,* supra, 521 F.2d at 252 (Citations omitted). Likewise, we hold that Hines acted in a fashion consistent with office policy and due process requirements as developed under the Fourth Amendment. We see no evidence that the parole officer either acted as a "stalking horse" for the police or "switched hats" in proceeding to search Green's bedroom following his arrest. Compare *Commonwealth v. Brown,* 240 Pa.Super. 190, 361 A.2d 846 (1976), with *Commonwealth v. Edwards,* 400 Pa.Super. 197, 583 A.2d 445 (1990).

The conduct of the parole officer was predicated upon a "reasonable belief" that a search was necessary to the

performance of his duties as a parole officer (to determine whether the Defendant was a good candidate for continued parole/rehabilitation and the protection of society from any wrong of the parolee) and this did not cease with the Defendant's arrest. *United States v. Richardson,* 849 F.2d 439 (9th Cir.1988); *United States v. Dally,* 606 F.2d 861, 863 (9th Cir.1979); *Latta,* supra; *Jarvis El,* supra.

Lastly, we find untenable the suppression court's argument that the parole officer should have obtained a warrant to search the Defendant's room, the absence of which converted the parole officer into a police officer seeking new criminal charges against the Defendant.

As discussed supra, the information possessed by the parole officer fell short of constituting probable cause in a warrant framework. The parole officer had no knowledge that the Defendant's room contained contraband justifying the issuance of a warrant until after he conducted the search. See *Commonwealth v. Devlin,* 294 Pa.Super. 470, 440 A.2d 562, 566 (1982) (Parole officer did not know of the incriminating nature of a diary described by parolee's mother as "alarming" until *after* she seized it and was able to digest its content, following which a warrant was secured to seize the document formally). This did not, however, foreclose the parole officer from carrying out his "normal duties" of satisfying himself, based on information received, that the Defendant was still a good parole risk. See *Griffin,* supra; *Commonwealth v. Miller,* 303 Pa.Super. 504, 450 A.2d 40 (1982); *Brown,* supra. We hold that the performance of such a function was accomplished by Hines without violating any rights of the Defendant under the Fourth Amendment to the United States Constitution.

Order reversed; jurisdiction relinquished.

HOFFMAN, J., files a dissenting statement.

HOFFMAN, Judge, dissenting:

I respectfully dissent. I first wish to emphasize that the parole officer's compliance with "office practice and proce-

dure" governing searches does not, on its own, make the search reasonable under the fourth amendment. A search made in compliance with such a practice could be proper only if the *practice itself* complies with constitutional standards—i.e., allows for searches only where there are "reasonable grounds" to believe that contraband will be found. *See Griffin v. Wisconsin,* 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987).[1] In the case at bar, the parole officer referred to an office policy pursuant to which agents would search the residence of a parolee whenever a parolee was taken into custody (even if the arrest occurred at the parole office), and whenever agents received information that a parolee may be involved with drugs. Because this "policy" allows for the search of a residence without regard to the likelihood ("reasonable grounds") that contraband would be found in the parolee's residence, the policy, in my view, is not "reasonable" within the meaning of the fourth amendment.

The next question is whether the search in this case nevertheless was reasonable because there were in fact reasonable grounds to believe that contraband would be found in appellant's residence. On this issue, I agree with the Honorable Russell M. Nigro in the court below, who observed that "[f]ruitless drug surveillance, an uncorroborated anonymous telephone call, a suspect wearing what appeared to be expensive jewelry, a suspect driving a Cadillac whose ownership was unverified, and a search of a room on a preceding night which disclosed nothing, do not

---

1. The search of the probationer in *Griffin* was conducted pursuant to a regulation which permitted warrantless searches of probationers as long as there were "reasonable grounds" to believe that contraband would be found. The *Griffin* Court did not make an extended inquiry into whether reasonable grounds in fact existed in that case because it found that the Wisconsin regulation complied with the fourth amendment and that there were "reasonable grounds" from which the Wisconsin Supreme Court could find that this regulatory standard had been met. 483 U.S. at 880 n. 8, 107 S.Ct. at 3172 n. 8. Under *Griffin,* then, a state regulation (and, perhaps, an informal practice such as that presented here?) governing the search of a probationer or parolee may be entitled to some deference, but only so long as the regulation conforms with fourth amendment standards.

[establish] reasonable grounds" to search a private residence without a warrant. *See* Suppression Court Opinion at 10, R.R. at 14a. I would add that, although a parolee's status justifies a reduced level of suspicion under the fourth amendment, the requirement that this suspicion be particular to the place to be searched remains in full force. And, in this case, although the facts known to the parole officer regarding appellee's activities and possessions warranted heightened scrutiny of appellee's activities, this information provided no reason to believe that contraband would be found at appellee's residence. Because I find that the warrantless search in this case was unreasonable, I would affirm the order of the suppression court.

Finally, it should be emphasized that this case is limited to the question of the legitimacy of the search under the fourth amendment of the United States Constitution. The question whether a similar result would follow under the search and seizure provision of the Pennsylvania Constitution, *see* Article 1, Section 8, which our Supreme Court has held to be *more protective* of individual privacy rights, *see, e.g., Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), is not before us.