**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Braheem SMITH, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 7, 2013.

Filed Jan. 31, 2014.

Patrick J. Connors, Public Defender, Media, for appellant.

John J. Whelan, District Attorney and William R. Toal, III, Assistant District Attorney, Media, for Commonwealth, appellee.

BEFORE: ALLEN, MUNDY, and FITZGERALD *, JJ.

OPINION BY ALLEN, J.:

Braheem Smith ("Appellant") appeals from the judgment of sentence imposed after the trial court convicted him of one count of possession with intent to deliver a controlled substance ("PWID").[1]

The pertinent facts may be summarized as follows: On August 29, 2010, Appellant, who had been imprisoned at SCI–Huntingdon for various drug-related offenses, was released on state parole. *See* Parole Release Order, 8/29/10. Prior to his release on parole, Appellant, on August 27, 2010, signed a form entitled Conditions Governing Parole/Reparole in which Appellant expressly consented to the search of his person, property and residence without a warrant by agents of the Pennsylvania Board of Probation and Parole. Pennsylvania Board of Probation and Parole Home Provider Agreement Letter; N.T., 9/28/12, at 14–15. In addition, Appellant's girlfriend, Naadiya Dennis, signed a Home Provider Agreement in which she agreed to have Appellant live at her residence, and consented to warrantless "searches" of her residence, and to unannounced "home visits" by parole agents. *Id.*

Following his release on parole, Appellant resided with Naadiya Dennis in Chester County, Pennsylvania. As of December 21, 2011, Appellant was under the parole supervision of Agent Scott Peterson of the Pennsylvania Board of Probation and Parole. N.T., 9/28/12, at 10. On December 21, 2011, as part of the City of Chester's Threat Initiative, Appellant's house was scheduled for a routine house "check" by parole agents, where high risk offenders, like Appellant, who have numerous convictions for drug sales and/or gun possession, have their residences checked. Trial Court Opinion, 6/11/13 at 4; N.T., 9/28/12, at 17. Additionally, sometime shortly before December 21, 2011, Agent Peterson received an anonymous phone call that Appellant was selling large amounts of marijuana in the Highland Gardens area of Chester. Trial Court Opinion, 6/11/13, at 4; N.T., 9/28/12, at 17, 44–45.

Agent Peterson obtained the approval of his supervisor, Mr. Swatski, to visit Appellant's residence, and on December 21, 2011, at approximately 10:10 p.m., Agent

---

* Former Justice specially assigned to the Superior Court.

1. 35 P.S. § 780–113(a)(30).

Peterson, supervisor Swatski and other Parole Agents visited Appellant's residence. N.T., 9/28/12, at 17–18. Appellant allowed the parole agents entry into the residence, and the agents proceeded to walk through the residence. *Id.* at 18–19, 26. At the door to the basement, Agent Peterson noticed a strong odor of un-burnt marijuana emanating from the basement area. *Id.* at 18–19. Upon opening the door, the odor became stronger. *Id.*[2] Agent Peterson then descended the basement stairs and located a large quantity of marijuana in a shopping bag under the basement stairs. *Id.* at 20–21; Trial Court Opinion, 6/11/13, at 4–5. Along with the suspected marijuana, Agent Peterson also recovered a large amount of money, a scale, unused baggies and a picture of Appellant. *Id.*

After discovering the marijuana, Agent Peterson returned upstairs to detain Appellant. N.T., 9/28/12, at 19. However, Appellant ran out the front door and fled. *Id.* The parole agents then notified the police and waited for the police to respond. *Id.* at 21. Trial Court Opinion, 6/11/13, at 5. Before the police arrived, Appellant's girlfriend, Naadiya Dennis, returned to the residence. *Id.*

At approximately 10:25 p.m., Officer Hoffman of the City of Chester Police Department arrived at the residence. N.T., 9/28/12, at 47. Following a search of the residence, the officer recovered 1 ¾ pounds of suspected marijuana, two boxes of live ammunition, a digital scale, a picture of Appellant and currency. *Id.* at 48. Ms. Dennis was taken into custody, and the police transported her, along with the evidence, to the police station. *Id.* at 49.

At approximately 12:44 a.m., on December 22, 2011, Appellant voluntarily appeared at the Chester Police Station and turned himself in. *Id.* at 50. Appellant was handcuffed and placed in a waiting area. *Id* at 51. Thereafter, Officer Hoffman, who was unarmed and dressed in plain clothes, removed Appellant's handcuffs, and took Appellant to an interview room to be interviewed. *Id.* at 51–52. Officer Hoffman immediately provided Appellant with *Miranda* warnings. *Id.* at 55. Appellant then initialed and signed a *Miranda* Statement and Rights Waiver form. *Id.*

After Appellant signed the *Miranda* Statement and Rights Waiver Form, Officer Hoffman provided Appellant with an interview sheet. *Id.* at 61. Officer Hoffman indicated to Appellant where he could write a statement on the form, and Appellant, unprompted, proceeded to provide a written statement. *Id.* at 62. In the course of providing his written statement, Appellant stopped to calculate on paper what he thought would be the quantity of the marijuana recovered from his residence. *Id.* at 62–64. Upon completing his calculations and written statement, Appellant signed them at 1:08 a.m. on December 22, 2011. *Id.* at 64; Trial Court Opinion, 6/11/13, at 6.

A criminal complaint was filed against Appellant on February 1, 2012. On September 7, 2012, Appellant filed a pre-trial motion to suppress the evidence obtained following the search of his residence and the statements Appellant made to police. The trial court conducted a suppression hearing on September 28, 2012. On December 7, 2012, the trial court denied Appellant's suppression motion. A stipulated non-jury trial commenced on February 1, 2013. That same day, the trial court found

---

**2.** Agent Peterson later testified that he did not know whether the basement door was opened or closed at the time he smelled the marijuana, stating that "it may have been half open." *Id.* at 40.

Appellant guilty of PWID, and sentenced Appellant to 24–48 months of imprisonment, to be followed by 5 years of probation. Appellant filed a timely notice of appeal. Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant raises two issues for our review:

Whether the Lower Court erred when it refused to suppress the fruits of an illegal warrantless search of [Appellant's] residence that occurred without reasonable suspicion or probable cause?

Whether the Lower Court erred when it refused to suppress the statement made by [Appellant] since it was coerced, written under duress, and therefore involuntary?

Appellant's Brief at 5.

■ Our scope and standard of review from the denial of a suppression motion are well settled:

An appellate court's standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [Because] the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Reese,* 31 A.3d 708, 721 (Pa.Super.2011) (citations omitted).

■ Appellant first argues that the agent's visit to his residence constituted a search that was not supported by reasonable suspicion and was therefore unconstitutional. Appellant's Brief at 13–18.

61 Pa.C.S.A. § 6153, pertaining to the supervisory relationship of State parole agents to offenders, provides, in relevant part:

**(b) Searches and seizures authorized.—**

(1) Agents may search the person and property of offenders in accordance with the provisions of this section.

\* \* \*

**(d)**

(2) A property search may be conducted by an agent if there is ***reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision.***

\* \* \*

(6) ***The existence of reasonable suspicion to search shall be determined in accordance with constitutional search and seizure provisions as applied by judicial decision.*** In accordance with such case law, the following factors, where applicable, may be taken into account:

(i) The observations of agents.

(ii) Information provided by others.

(iii) The activities of the offender.

(iv) Information provided by the offender.

(v) The experience of agents with the offender.

(vi) The experience of agents in similar circumstances.

(vii) The prior criminal and supervisory history of the offender.

(viii) The need to verify compliance with the conditions of supervision.

61 Pa.C.S.A. § 6153 (emphasis added). *See also Commonwealth v. Williams*, 547 Pa. 577, 692 A.2d 1031, 1035 (1997) (internal citations omitted) ("A parolee and a probationer have limited Fourth Amendment rights because of a diminished expectation of privacy."); *Commonwealth v. Colon*, 31 A.3d 309, 315 (Pa.Super.2011) *quoting Commonwealth v. Hunter*, 963 A.2d 545, 551–52 (Pa.Super.2008) ("Because the very assumption of the institution of parole is that the parolee is more likely than the ordinary citizen to violate the law, the agents need not have probable cause to search a parolee or his property; instead, reasonable suspicion is sufficient.") (citations omitted).

At the time of Appellant's release on parole, the Pennsylvania Board of Probation and Parole issued a parole agreement signed by Appellant, and a Home Provider Agreement signed by Naadiya Dennis, which distinguished between a "search" that requires reasonable suspicion to be valid, and a "home visit" which may occur unannounced at any time. The parole agreement signed by Appellant provides:

I expressly consent to the *search* of my person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and parole. Any items in the possession of which constitutes a violation of parole/reparole shall be subject to seizure, and may be used as evidence in the parole revocation process.

Pennsylvania Board of Probation and Parole Conditions Governing Parole/Reparole, 8/27/10.

The Home Provider Agreement Letter signed by Ms. Dennis provides:

... the parole supervision staff conduct scheduled and unannounced *home visits* at any time.

... the parole supervision staff [have] a right to *search* the residence at anytime when *reasonable suspicion* exists that conditions of supervision have been violated.

Pennsylvania Board of Probation and Parole Home Provider Agreement Letter.

Appellant claims that the parole agents' visit to his residence constituted a search that was not supported by reasonable suspicion and was therefore unconstitutional. Appellant's Brief at 13–18. Agent Peterson testified about the circumstances surrounding his visit to Appellant's residence as follows:

Assistant District Attorney: Why did you conduct a home visit?

Agent Peterson: If I recall, it was either we had information that there was some kind of drug sales, or we do what's called a Chester threat initiative, where we go to high-risk offenders who have numerous convictions for drug sales, gun possession, and we go to the residence and do checks, with the authorization of a supervisor.

\* \* \*

Assistant District Attorney: And what happened after you entered the residence?

Agent Peterson: [W]hen we go in the residence, we're just checking common areas, bedrooms. Just anything in plain sight that may be a violation of his probation and parole. I believe a couple of agents went upstairs. I went through the kitchen, or through the living room to the kitchen area. Went to the basement door. Opened the basement door and could smell a ... substantial smell of ... unburnt marijuana.

\* \* \*

[M]yself and I believe another agent went downstairs. Once we were walking down the steps, the smell got even stronger. [We] located the marijuana.... I was coming up the stairs to detain [Appellant], and he fled out of the front door.

N.T., 9/28/12, at 17–19.

■■■■ Upon careful review, we agree with the trial court's decision to deny Appellant's suppression motion. "[T]he threshold question ... in any Fourth Amendment inquiry is whether the conduct of the police amounted to a search." *Commonwealth v. Robbins,* 436 Pa.Super. 177, 647 A.2d 555, 558 (1994) *quoting Katz v. United States,* 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967). Here, Appellant was on parole at the time State Parole Agent Scott Peterson arrived at his home. "[State parole] [a]gents are in a supervisory relationship with their offenders. The purpose of this supervision is to assist the offenders in their rehabilitation and reassimilation into the community and to protect the public." 61 Pa. C.S.A. § 6153(a). "Supervision practices shall reflect the balance of enforcement of the conditions of parole and case management techniques to maximize successful parole completion through effective reentry to society." *Id.* As such, "[p]robationers and parolees are subject to general and individual rules of conduct and supervision described at sentencing and/or in the parole agreement." *Fross v. County of Allegheny,* 610 Pa. 421, 20 A.3d 1193, 1197 (2011). *See also* 61 Pa.C.S.A. 6102(1) ("The parole system provides several benefits to the criminal justice system, including the provision of adequate supervision of the offender while protecting the public, the opportunity for the offender to become a useful member of society and the diversion of appropriate offenders from prison."); *Pennsylvania Bd. of Prob. & Parole v. Scott,* 524 U.S. 357, 365, 118 S.Ct. 2014, 2020, 141 L.Ed.2d 344 (1998) ("Parole is a variation on imprisonment of convicted criminals, in which the State accords a limited degree of freedom in return for the parolee's assurance that he will comply with the often strict terms and conditions of his release[;] [i]n most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements.") (citations and internal quotations omitted); ("While parole is a provisional release and an amelioration of punishment, it may be said to be, in legal effect, an imprisonment. It is a means of keeping a watchful eye on the convict outside the prison walls."). *Com. ex rel. Alexander v. Rundle,* 206 Pa.Super. 528, 214 A.2d 304, 306 (1965).

In furtherance of their duty to supervise Appellant, Agent Peterson and other parole agents visited Appellant at his residence. The visit was conducted pursuant to the Chester Threat Initiative, which monitors high-risk offenders, in combination with Agent Peterson's receipt of an anonymous telephone call that Appellant was involved in drug sales. N.T., 9/28/12, at 17. Upon arriving at Appellant's residence, Agent Peterson informed Appellant that he and the other agents present were conducting a home visit or "house check" to monitor Appellant's compliance with his parole conditions. *Id.* at 29–30. In performing the home visit, Agent Peterson testified that the agents were "just checking common areas, bedrooms. Just anything in plain sight that may be a violation of his probation and parole." *Id.* at 18. While Agent Peterson testified that during the course of such a home visit he would have "look[ed] into" various rooms in the residence, he testified that he did not recall opening any closet doors, or lifting up mattresses. *Id.* at 38–39. Rather, in furtherance of the home visit, Officer Peterson testified that he "went through the ...

living room to the kitchen area. Went to the basement door. Opened the basement door and could smell a . . . substantial smell of . . . unburnt marijuana." *Id.* at 18.

We conclude that the state parole agent's actions in walking through Appellant's residence did not constitute a search. Rather, the parole agents were performing their supervisory duties by visiting Appellant at his home to ensure his compliance with the conditions of his probation.[3] The visit, which did not progress beyond a visual inspection, was limited in its scope and intrusiveness. The record indicates that the walk-through was of short duration, occurring between 10.10 p.m. and 10:25 p.m. N.T., 9/28/12 at 18, 47. Additionally, the record does not indicate that the parole agents did anything more than walk through the various rooms "checking [for] anything in plain sight." *Id.* at 18.

 During this lawful visit, Agent Peterson smelled marijuana emanating from Appellant's basement, and at that juncture, he developed the requisite reasonable suspicion to conduct a search for the marijuana. Notably, the 'plain view' doctrine renders a search and seizure permissible where: "(1) the [government officials] have not violated the Fourth Amendment in arriving at the location from which the item could be viewed; (2) the item is in plain view; (3) the incriminating character of the item is immediately apparent; and (4) the [government officials] have a lawful right of access to the item itself." *Commonwealth v. Jones*, 605 Pa. 188, 988 A.2d 649, 656 (2010). *See also Commonwealth v. Copeland*, 955 A.2d 396, 401 (Pa.Super.2008) (explaining that this court has analogized a "plain smell" concept with that of plain view, and held that where an officer is justified in being where he is, his detection of the odor of marijuana is sufficient to render a search constitutionally permissible). Given that the parole agents were visiting Appellant at his residence in accordance with their supervisory duties, the smell of marijuana gave rise to reasonable suspicion for the agents to conduct a search for the contraband that was ultimately located in the basement. N.T., 9/28/12, at 20. Accordingly, we find no error in the trial court's denial of Appellant's motion to suppress the evidence obtained from Appellant's residence.

 Appellant next argues that his subsequent confession to the police was coerced and should have been suppressed. Appellant's Brief at 19–22. We disagree.

When a court is called upon to determine whether a confession is voluntary and, hence, admissible at trial, it examines the totality of the circumstances surrounding the confession to ascertain whether it is the product of an essentially free and unconstrained choice by its maker. In making this inquiry, a court is not concerned with the issue of whether the substance of the confession is

---

**3.** *See United States v. LeBlanc,* 490 F.3d 361, 369 (5th Cir.2007) (distinguishing between searches that require reasonable suspicion and home visits, holding that a probation officer's brief walk through the rooms in the home, and plain-view seizure of a shotgun, did not violate the Fourth Amendment, even though the officer lacked reasonable suspicion that defendant was engaged in criminal activity, explaining that "[w]ere we to impose a requirement that a probation officer show reasonable suspicion of criminal activity before visiting a probationer at his home, supervision would become effectively impossible"); *State v. Moody,* 334 Mont. 517, 148 P.3d 662 (2006) (probation officer's home visit does not constitute a search; less intrusive home visits serve to ensure that the supervised felon is abiding by the conditions of her probation, thus addressing the problem of recidivism and protecting the safety and welfare of society); *State v. Greeson,* 336 Mont. 1, 152 P.3d 695 (2007); *Volkomer v. State,* 168 Md.App. 470, 897 A.2d 276 (2006).

true. Rather, a court is constrained to examine only whether an individual's confession was the product of coercion, duress, or the use of other measures by interrogators deliberately calculated to overcome his or her free will.

*Commonwealth v. Wright*, 609 Pa. 22, 14 A.3d 798, 815 (2011) (citations and internal quotations omitted).

Here, Appellant's confession constituted an act of free will. Appellant fled from his residence voluntarily, and absconded for an interval of approximately three hours, after which, of his own volition, he appeared at the police station and confessed. N.T., 9/28/12, at 47, 50. When Appellant subsequently turned himself if at the police station, he was promptly provided with *Miranda* warnings, and signed a written waiver of his rights before giving his written confession. *Id.* at 53, 55–65. Officer Hoffman testified that he did not threaten or coerce Appellant in any way. *Id.* at 54, 66–67. While Appellant claims that he confessed in order to secure Ms. Dennis' release, there is no indication that Appellant's choice to do so was not an act of free will, or that Appellant was coerced. Officer Hoffman testified that prior to his confession, Appellant asked whether Ms. Dennis would be released if he confessed, to which officer Hoffman responded "as far as I know, yes," explaining that where someone takes responsibility for a crime, it is common practice to drop the charges against other suspects. *Id.* at 76. Moreover, Officer Hoffman testified that he did not use Ms. Dennis' arrest as leverage to induce Appellant's confession, and that he did not make any promises to Appellant in return for his confession. *Id.* at 65–67, 73, 76. *See Commonwealth v. Fleck*, 324 Pa.Super. 227, 471 A.2d 547, 550 (1984) (defendant's assertion that his confession was prompted by a desire to protect his girlfriend did not render the confession coercive, *per se*, but was merely evidence which could be considered by the trial court in determining whether the accused's will had been overborne); *Commonwealth v. Ozovek*, 270 Pa.Super. 468, 411 A.2d 814, 815 (1979) ("Appellant's contention that he confessed out of fear that his wife might be implicated would not negate, as a matter of law, voluntariness[;] it is simply additional evidence which the court is free to believe or disbelieve.").

Additionally, there is no indication in the record that Officer Hoffman exploited the marijuana seized from Appellant's residence to coerce Appellant's confession. Nor is there any evidence Appellant was otherwise pressured, harassed, or subjected to any form of duress. Thus, although Appellant asserts that his confession was coerced, the record belies this contention. As the trial court explained:

> There is no credible evidence on the record to show that [Appellant's] will was overcome; he was not coached, or manipulated, or coerced to confess. [Appellant] walked into the police station of his own volition. [Appellant's] intent at the time he freely walked into the police station, proven by his own testimony, was to admit possession of the marijuana in an effort to seek his girlfriend's release.

> [Appellant] has had four prior convictions of [PWID]. He is experienced and has a level of sophistication in the criminal justice system. [Appellant] chose to present himself and make an admission to the police, before even coming in contact with any law enforcement. There is no credible evidence that Officer Hoffman's interrogation was manipulative. Not only did [Appellant] voluntarily waive his rights and provide a written statement, [Appellant] voluntarily calculated for Officer Hoffman approximately how much marijuana he believed the

police found. At no point was [Appellant's] "self-direction" lost from the time he voluntarily arrived at the police station to confess to the time that he actually confessed.

Trial Court Opinion, 6/11/13, at 8–9 (citation to notes of testimony omitted). Given the totality of the circumstances, we conclude that Appellant's confession was not coerced. Accordingly, the trial court did not err in denying Appellant's motion to suppress his confession.

Based on the foregoing, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Justice FITZGERALD files a Concurring Statement.

### CONCURRING STATEMENT BY FITZGERALD, J.:

The majority cogently holds that the numerous parole agents conducted a mere administrative visit. I respectfully concur to express my belief that this case circumscribes the outer boundaries of both a warrantless intrusion into a parolee's home, as well as our deference to the credibility and factual findings of the suppression court.

In *Commonwealth v. Brown*, 240 Pa.Super. 190, 361 A.2d 846 (1976), this Court distinguished parole agents' administrative and law enforcement functions and suppressed evidence seized from the parolee's residence. *Id.* at 850. The Court reasoned that "[o]nce [the parole agent] 'switched hats' and, in all relevant respects, became a police officer, the administrative justification that generally permitted him to avoid acquisition of a warrant was no longer applicable." *Id.* Similarly, in *Commonwealth v. Pickron*, 535 Pa. 241, 634 A.2d 1093 (1993), the Pennsylvania Supreme Court stated, "It is a matter of federal law and state law that

parole and probation officers cannot act like 'stalking horses' for the police." *Id.* at 1097. *Pickron* and *Brown* thus stand for the proposition that a claimed administrative intrusion by a parole officer may unreasonably burden the constitutional right of privacy afforded to a parolee.

Although *Pickron* and *Brown* were decided before the enactment of statutory regimes governing searches of parolees and probationers, the Pennsylvania Supreme Court has recognized a parolee's limited constitutional right to privacy. *See Commonwealth v. Williams*, 547 Pa. 577, 692 A.2d 1031, 1035–36 (1997). Moreover, in response to *Pickron* and *Brown*, the General Assembly enacted statutes requiring that warrantless searches of probationers and parolees be supported by reasonable suspicion. *See* 61 P.S. § 6135; *cf. Commonwealth v. Wilson*, 67 A.3d 736, 744 (Pa.2013). Therefore, I believe the principles expressed in *Pickron* and *Brown* continue to guide our consideration of an administrative function such as a home visit, which require neither a warrant nor reasonable suspicion, and a "search" governed by the constitutional mandate of reasonable suspicion. *See Commonwealth v. Altadonna*, 817 A.2d 1145, 1153 (Pa.Super.2003) (noting that determination "whether parole officers are acting as 'stalking horses' of the police when they conduct searches of parolees, thereby circumventing the warrant requirement, is pertinent ...").

Instantly, Agent Peterson testified that he conducted a home visit in this case based on "information that there was some kind of drug sales, or ... what's called a Chester threat initiative." N.T., 9/28/12, at 17. That "visit" was conducted by Agent Peterson, his supervisor, Chris Swatski, "Agent James, Agent Charles, [and] probably one or two other people." *Id.* at 18. However, on cross examination,

**540**

he acknowledged that he "normally would go on a normal home visit by [him]self." *Id.* at 24.

Based on this record, I hesitate to conclude that the agents were conducting a mere administrative visit. *See Pickron,* 634 A.2d at 1097. Indeed, to the extent that the trial court found that the agents were investigating information of "some kind of drug sales," I would conclude that the agents conducted a search without reasonable suspicion. *See Altadonna,* 817 A.2d at 1152 (discussing reliability of informant); *see generally, Commonwealth v. Wimbush,* 561 Pa. 368, 750 A.2d 807, 810–12 (2000) (holding that anonymous tip that defendant was carrying drugs did not create reasonable suspicion that criminal activity was afoot).

However, there was competing evidence presented at the suppression hearing in this case. Agent Peterson testified that another reason for "visiting" Appellant's residence was the Chester Threat Initiative. N.T. at 17. When seeking relief before this Court, Appellant did not address whether this initiative constituted a search requiring reasonable suspicion. Therefore, given the absence of argument regarding the Chester Threat Initiative, I conclude that we do not have an adequate basis to reverse the court's legal conclusions that the agents were conducting an administrative function.

Thus, I respectfully concur.