J-A22033-16

2016 PA Super 280

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| DAYQUAN E. PARKER | |
| Appellee | No. 340 MDA 2016 |

Appeal from the Order Entered February 5, 2016
In the Court of Common Pleas of Lancaster County
Criminal Division at No(s): CP-36-CR-0001552-2015

BEFORE: GANTMAN, P.J., PANELLA, J., and JENKINS, J.

OPINION BY GANTMAN, P.J.:                    **FILED DECEMBER 12, 2016**

Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Lancaster County Court of Common Pleas, which granted in part the pretrial suppression motion of Appellee, Dayquan E. Parker. We affirm the trial court's denial of suppression of some of the evidence, reverse the trial court's suppression of other evidence, and remand for further proceedings.

The relevant facts and procedural history of this case are as follows. On April 23, 2014, Appellee entered a negotiated guilty plea at docket number CP-36-CR-0005580-2013, to charges of fleeing or attempting to elude a police officer, reckless driving, driving without a license, and other motor vehicle violations. The court sentenced Appellee that day to two years' probation for the fleeing or attempting to elude a police officer

conviction and imposed no further penalty for the remaining offenses. Appellee reviewed and signed Probation and Parole Regulations ("Regulations"), which detailed the terms and conditions of his probation. The Regulations provided, in relevant part, as follows:

**Probation and Parole Regulations**

\* \* \*

2. I will live in a residence approved by my probation officer.  I will not change my residence without the approval of my probation officer.  **My probation officer may visit my home at any time in order to effectively confirm compliance with the conditions of my supervision**, and I will cooperate with the efforts of my probation officer when he/she does so.

\* \* \*

6. I will not possess, have control of, or have in my place of residence or vehicle, any contraband such as stolen property, non-prescribed controlled substances, drug paraphernalia, firearms (hand guns, rifles, shotguns) or other deadly weapons, including, but not limited to, bow and arrow, prohibited offensive weapons, or any instruments of crime.  **I will submit my person, property, place of residence, vehicle and personal effects to search at any time by my probation officer based upon reasonable suspicion that I am in possession of contraband**.

\* \* \*

8. I will abstain from the unlawful possession, use or delivery of any non-prescribed controlled substances, including marijuana.  I will submit to urinalysis and/or breathalyzer testing as required by my probation officer. Any refusal to submit to testing will be considered a violation of my supervision.  I will reimburse the court for the cost of laboratory fees sustained upon positive confirmation of drug use.

* * *

(Regulations, dated April 23, 2014, at 1 ¶¶ 2, 6, 8) (emphasis added). Adult Probation and Parole Services ("APPS") staff member Madeline Olivera reviewed the Regulations with Appellee. Appellee signed the last page of the Regulations below the "Acknowledgment" stating: "I hereby acknowledge that I have read, or have had read to me the foregoing rules, regulations and special conditions of my probation/parole. I fully understand and agree to follow the rules and I understand the penalties should I be found in violation." (*Id.* at 3).

On February 12, 2015, at approximately 12:00 p.m., several probation officers from APPS' Special Intervention Unit ("SIU") went to Appellee's residence to verify Appellee's compliance with the terms and conditions of his probation. The SIU officers wore official attire and displayed their badges. The probation officers encountered Appellee at the rear of the residence; Appellee was holding his daughter in his arms and restraining his dog. After explaining the purpose of their visit, the probation officers asked Appellee to control his dog, and Appellee complied. The probation officers stepped inside the doorway to Appellee's kitchen and immediately observed, in plain view, clear, empty, corner-cut baggies; cigar packages, which were opened and discarded on the floor; and small rubber bands. From the probation officers' training and experience, they recognized these items as drug paraphernalia. The probation officers also saw a shotgun in an open

- 3 -

closet in the kitchen. The probation officers then asked Appellee to have someone watch his daughter. Appellee handed his daughter to a woman present in the residence.

Appellee accompanied the probation officers to the third floor of the residence and Appellee's bedroom. Appellee sat down on a box spring/mattress that was on the floor. The probation officers noticed a box of nine-millimeter rounds on the floor next to the box spring/mattress. In a half-open dresser drawer, the officers also saw clear, empty baggies, U.S. currency, and a digital scale. Additionally, the probation officers observed some type of attachment to a device used to smoke marijuana, which had liquid dripping from it. The probation officers also observed several prohibited knives. At this point, the probation officers placed Appellee in handcuffs.

Agent Joseph Schauren, the team leader for the SIU, called his deputy director, Mike Hansberry, who gave the probation officers permission to search the residence based on what the probation officers had observed in plain view. Agent Schauren next called Detective John Burkhart of the Lancaster County Drug Task Force ("DTF"), who agreed to send DTF agents to Appellee's residence. Three DTF agents arrived at the residence approximately fifteen minutes later. The probation officers asked the DTF agents if they were interested in pursuing charges based on what the probation officers had seen in plain view. After some discussion, the DTF

agents decided not to pursue a search warrant or criminal charges against Appellee. Before leaving the residence, the DTF agents contacted the Lancaster City Code of Compliance Authority ("CCA") to report the deplorable living conditions in Appellee's residence. The DTF agents then left the premises. Agents of CCA arrived shortly thereafter, photographed the residence, and stated their intent to condemn the home. After the CCA agents left, some of the probation officers took Appellee to a holding cell at the APPS' office.

With prior approval from their deputy director, the remaining probation officers performed the authorized search of Appellee's residence. The probation officers opened a refrigerator in Appellee's bedroom located directly next to the box spring/mattress, discovered suspected cocaine, removed the substance, and conducted a field test in the kitchen; it tested positive for cocaine.[1] At that point, Agent Schauren placed a second call to Detective Burkhart, who sent two drug task force agents back to Appellee's residence. When the DTF agents arrived, they observed the cocaine and filed a criminal complaint against Appellee for possession of a controlled substance with the intent to deliver ("PWID") and possession of drug paraphernalia.[2]

---

[1] The cocaine weighed approximately 7.4 grams.

[2] 35 P.S. §§ 780-113(a)(30), (32), respectively.

On October 7, 2015, Appellee filed a motion to suppress. Appellee argued the probation officers' entry into Appellee's residence constituted a search lacking reasonable suspicion.[3] Appellee further claimed the probation officers' search of the refrigerator was unlawful where the DTF agents had declined to pursue a search warrant or criminal charges. Appellee maintained the probation officers acted as "stalking horses" for the DTF agents and exceeded the scope of their authority by searching for evidence of new crimes after they had already discovered the evidence of probation violations. Appellee sought suppression of all items the probation officers observed in plain view as well as the cocaine recovered from the refrigerator.

The court held a suppression hearing on January 15, 2016. The Commonwealth introduced testimony/evidence from Agent Schauren and Detective Ryan Kelly of the DTF. Agent Schauren testified, *inter alia*, that his deputy director asked him to conduct an unannounced "home visit" at Appellee's residence on February 12, 2015. Agent Schauren explained a home visit occurs when probation officers visit a probationer's residence to confirm he is complying with the terms of his probation. Agent Schauren highlighted that the Regulations expressly permitted a probation officer to

---

[3] Appellee insisted the probation officers' visit was based on two uncorroborated, anonymous tips that Appellee was selling drugs. Nothing in the record supports this contention. Appellee abandoned his claim at the suppression hearing and on appeal. Thus, we give it no further attention.

visit Appellee's home at any time to confirm Appellee's compliance with the Regulations. Agent Schauren described a typical home visit, during which the probation officers would make contact with the probationer, explain their presence, and conduct a "tour" of the residence. During a home visit, the probation officers first make only a visual inspection of the probationer's residence. If the officers do not see evidence of a probation violation, they will conclude the home visit and leave. If, however, the probation officers observe items in plain view, which are considered probation violations, then the probation officers can search the premises, once they obtain permission from their supervisor, based on reasonable suspicion that the probationer is in possession of contraband.

During the course of the probation officers' home visit at Appellee's residence, Agent Schauren said he observed, in plain view, clear, empty, corner-cut baggies; cigar packages, which had been opened and discarded; small rubber bands; a digital scale; and an attachment to a smoking device, with liquid dripping from it. Agent Schauren immediately recognized these items as drug paraphernalia, based on his training and experience. Agent Schauren described how the small, clear baggies are often used to package drugs and the cigars can be hollowed-out to smoke marijuana. Agent Schauren said he also saw, in plain view, a shotgun, ammunition, and several prohibited knives. Appellee's possession of these items constituted violations of his probation as set forth in the Regulations. Agent Schauren

placed Appellee in handcuffs due to these violations. Agent Schauren contacted his deputy director for permission to search the residence; Deputy Hansberry granted permission to search.

Agent Schauren explained how he initially contacted Detective Burkhart to ask if the DTF wanted to pursue any charges arising from the probation violations. Agent Schauren said contacting the local police is "standard predicate" in these circumstances. Agent Schauren confirmed that his phone call to Detective Burkhart was the first conversation Agent Schauren had with the DTF concerning Appellee's residence. Agent Schauren made clear there was no prior arrangement with the DTF regarding Appellee's residence. Agent Schauren did not ask the DTF agents to perform a search upon their arrival; he asked only if they were interested in pursuing charges based on the items the probation officers had seen in plain view. Agent Schauren stated the DTF agents decided not to pursue a search warrant or criminal charges. After the DTF agents left, the probation officers conducted a search of the residence, which led to their discovery of cocaine in a refrigerator in Appellee's bedroom. Notwithstanding their prior discovery of sufficient evidence of probation violations, Agent Schauren emphasized that performing a search was necessary because the probation officers believed Appellee might have a firearm or quantities of drugs in the residence which Appellee should not have access to if he returned home following his arrest and/or incarceration. (**See** N.T. Suppression Hearing,

1/15/16, at 4-51; R.R. at 13a-25a.)

Detective Kelly testified, *inter alia*, that when he arrived at Appellee's residence with two other officers, Agent Schauren showed them what they had observed in plain view. Detective Kelly decided the evidence might not be enough for a search warrant. After discussion with his fellow officers, Detective Kelly declined to contact the District Attorney's Office to bring charges. Detective Kelly said he was not familiar with Appellee before he arrived at Appellee's residence. Detective Kelly confirmed that none of the probation officers asked any of the DTF agents to search the residence. Detective Kelly also made clear he had no interaction with anyone from the probation office before Detective Burkhart dispatched him to Appellee's residence. (*See id.* at 52-59; R.R. at 25a-27a.) Following Detective Kelly's testimony, the Commonwealth rested. The defense presented no testimony/evidence at the suppression hearing.

The court heard argument from counsel. Appellee's counsel argued: (1) the probation officers lacked consent or authority to enter and "tour" Appellee's residence; and (2) the probation officers acted as "stalking horses" for the DTF, exceeding their capacity as probation officers. In support of his second argument, Appellee claimed probation officers' duties are limited to discovering probation violations; once the probation officers found evidence of Appellee's probation violations, they lacked authority to perform any search to look for evidence of new crimes. In response, the

Commonwealth argued: (1) the probation Regulations expressly permitted unannounced home visits to ensure compliance with the terms and conditions of Appellee's probation; (2) the probation officers observed contraband in plain view, which violated the terms of Appellee's probation and gave the officers reasonable suspicion to perform an authorized search; (3) the probation officers were obligated to search Appellee's residence to ensure Appellee would return to a contraband-free home; and (4) no evidence indicated the probation officers acted as "stalking horses" for the DTF.

The court rejected outright Appellee's lack of consent argument. The court also stated it was inclined to deny the suppression motion with respect to the items the probation officers had observed in plain view. Nevertheless, the court expressed reservations about the probation officers' subsequent search of the residence. The court directed the parties to submit post-hearing memoranda regarding applicability of the "stalking horse" doctrine and whether the probation officers exceeded the scope of their duties by performing a search after the DTF agents declined to pursue charges. The Commonwealth and Appellee filed post-hearing memoranda on January 26, 2016.

On February 5, 2016, the court denied Appellee's suppression motion with respect to the items the probation officers had observed in plain view; the court granted Appellee's motion to suppress the cocaine found in the

refrigerator in his bedroom. The Commonwealth timely filed a notice of appeal on February 22, 2016, pursuant to Pa.R.A.P. 311(d) (allowing Commonwealth to appeal as of right in criminal case from pretrial order, where Commonwealth certifies in notice of appeal that order will terminate or substantially handicap prosecution). On February 24, 2016, the court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which the Commonwealth timely filed on March 4, 2016.

The Commonwealth raises one issue for our review:

> WHETHER THE TRIAL COURT ABUSED ITS DISCRETION BY GRANTING [APPELLEE'S] MOTION TO SUPPRESS WHERE THE PROBATION OFFICE[RS] HAD REASONABLE SUSPICION TO SEARCH [APPELLEE'S] RESIDENCE.

(Commonwealth's Brief at 4).

When the Commonwealth appeals from a suppression order, the relevant scope and standard of review are:

> We consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. As long as there is some evidence to support them, we are bound by the suppression court's findings of fact. Most importantly, we are not at liberty to reject a finding of fact which is based on credibility.

***Commonwealth v. Goldsborough***, 31 A.3d 299, 305 (Pa.Super. 2011), *appeal denied*, 616 Pa. 651, 49 A.3d 442 (2012) (internal citation omitted). "The suppression court's conclusions of law, however, are not binding on an

appellate court, whose duty is to determine if the suppression court properly applied the law to the facts." **Id.** (internal citation omitted).

The Commonwealth argues the probation officers discovered, in plain view, drug paraphernalia, a shotgun, ammunition, and prohibited knives, during their authorized home visit. The Commonwealth asserts Appellee's possession of these items constituted violations of his probation and gave the probation officers reasonable suspicion to search the residence for other contraband that might be present. The Commonwealth maintains that, given reasonable suspicion, the probation officers had only to obtain permission from a supervisor to perform a search. The Commonwealth emphasizes the probation officers obtained the necessary permission from their supervisor to search Appellee's residence. The Commonwealth submits the search was reasonably related to the probation officers' duties to confirm compliance with the terms of Appellee's probation, as detailed in the Regulations, and to protect the public from illegal activity. As well, the Commonwealth contends the search was necessary to ensure the residence would be contraband-free when Appellee returned. The Commonwealth concludes the trial court's suppression of evidence was improper, and this Court must reverse and remand for further proceedings.

In response, Appellee concedes probation officers can search a probationer's residence on the basis of reasonable suspicion, but he argues the search must be limited in scope to whether the probationer committed

any probation violations. Appellee asserts the probation officers' search in this case was unlawful because they searched for evidence of new crimes, after they had discovered multiple probation violations. Appellee claims the probation officers' duties ceased once they discovered evidence of Appellee's probation violations, placed him in custody, and removed him from the home, so the search of the refrigerator exceeded the scope of their duties. Appellee maintains the sole motivation for the probation officers to call the DTF was to look for evidence of new crimes. Appellee insists that after the DTF agents declined to pursue a search warrant or charges and left the residence, the probation officers had no authority to look for evidence of new crimes. Appellee contends the probation officers effectively "switched hats" to act as "stalking horses" for the police, after the DTF agents had gone, and search for evidence of new crimes. Appellee suggests the probation officers' duty to ensure Appellee returned to a contraband-free home was mere pretext, because Appellee was physically unable to return home until his release from prison for the probation violations and the CCA had condemned his residence. Appellee concludes the court properly suppressed the cocaine, and this Court should affirm that decision.[4] For the following reasons, we agree with the Commonwealth's position.

The aim of probation and parole is to rehabilitate and reintegrate a

---

[4] Appellee does not challenge the trial court's denial of his motion to suppress the items discovered in plain view.

lawbreaker into society as a law-abiding citizen. *Commonwealth v. Chambers*, 55 A.3d 1208, 1212 (Pa.Super. 2012). The institution of probation and parole assumes a probationer or parolee is more likely than the ordinary citizen to violate the law. *Commonwealth v. Moore*, 805 A.2d 616, 619 (Pa.Super. 2002). Consequently, probationers and parolees have limited Fourth Amendment rights because of a diminished expectation of privacy. *Id. See also Chambers, supra* (stating probationers' and parolees' Fourth Amendment constitutional rights are virtually indistinguishable). This Court explained that probation officers, like parole officers:

> [A]re in a supervisory relationship with their offenders. The purpose of this supervision is to assist the offenders in their rehabilitation and reassimilation into the community and to protect the public. Supervision practices shall reflect the balance of enforcement of the conditions of parole and case management techniques to maximize successful parole completion through effective reentry to society. As such, probationers and parolees are subject to general and individual rules of conduct and supervision described at sentencing and/or in the parole agreement.

*Commonwealth v. Smith*, 85 A.3d 530, 536 (Pa.Super. 2014) (internal citations and quotation marks omitted).

The statute governing the supervisory relationship between probation officers and probationers and the concomitant rights of the probationers, in effect at the time of the search in this case, provided in relevant part:

**§ 9912. Supervisory relationship to offenders**

**(a) General rule.**—Officers are in a supervisory

relationship with their offenders. The purpose of this supervision is to assist the offenders in their rehabilitation and reassimilation into the community and to protect the public.

**(b) Searches and seizures authorized.─**

(1) Officers and, where they are responsible for the supervision of county offenders, State parole agents may search the person and property of offenders in accordance with the provisions of this section.

\* \* \*

**(c) Effect of violation.─**No violation of this section shall constitute an independent ground for suppression of evidence in any probation and parole or criminal proceeding.

**(d) Grounds for personal search.─**

(1) A personal search of an offender may be conducted by an officer:

(i) if there is a reasonable suspicion to believe that the offender possesses contraband or other evidence of violations of the conditions of supervision;

(ii) when an offender is transported or taken into custody; or

(iii) upon an offender entering or leaving the securing enclosure of a correctional institution, jail or detention facility.

(2) **A property search may be conducted by an officer if there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision.**

(3) **Prior approval of a supervisor shall be obtained for a property search absent exigent**

**circumstances.** No prior approval shall be required for a personal search.

(4) A written report of every property search conducted without prior approval shall be prepared by the officer who conducted the search and filed in the offender's case record. The exigent circumstances shall be stated in the report.

(5) The offender may be detained if he is present during a property search. If the offender is not present during a property search, the officer in charge of the search shall make a reasonable effort to provide the offender with notice of the search, including a list of the items seized, after the search is completed.

(6) **The existence of reasonable suspicion to search shall be determined in accordance with constitutional search and seizure provisions as applied by judicial decision. In accordance with such case law, the following factors, where applicable, may be taken into account**:

(i) The observations of officers.

(ii) Information provided by others.

(iii) The activities of the offender.

(iv) Information provided by the offender.

(v) The experience of the officers with the offender.

(vi) The experience of officers in similar circumstances.

(vii) The prior criminal and supervisory history of the offender.

(viii) The need to verify compliance with the conditions of supervision.

* * *

42 Pa.C.S.A. § 9912(a), (b)(1), (c), (d) (effective October 13, 2009 to September 18, 2016) (emphasis added).[5] **See also** 42 Pa.C.S.A. § 9913 (explaining probation officer is declared to be peace officer and shall have police powers and authority to arrest, with or without warrant, writ, rule or process, any person on probation under supervision of court for failing to report as required by terms of that person's probation, or for any other violation of that person's probation).

"The policy behind [Section 9912] is to assist the offenders in their rehabilitation and reassimilation into the community and **to protect the public**." **Moore, supra** at 620 (emphasis in original). "Essentially, Section 9912 authorizes county probation officers to search a probationer's person or property, if there is reasonable suspicion to believe the probationer possesses contraband or other evidence of violations of the conditions of supervision." **Chambers, supra** at 1214 (citing 42 Pa.C.S.A. § 9912(d)(1)(i), (d)(2)). "Reasonable suspicion to search must be determined consistent with constitutional search and seizure provisions as applied by judicial decisions; and in accordance with such case law, enumerated factors, where applicable, may be taken into account." **Chambers, supra**

_____

[5] The legislature amended this statute on July 20, 2016, effective in 60 days. The current version of the statute contains substantially similar language. **See** 42 Pa.C.S.A. § 9912 (amended July 20, 2016; effective September 19, 2016).

(citing 42 Pa.C.S.A. § 9912(d)(6)).

> In establishing reasonable suspicion, the fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate. This assessment, like that applicable to the determination of probable cause, requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in terms of both quantity or content and reliability.

*Moore, supra* at 619-20 (internal citations and quotation marks omitted).

"[T]he threshold question in cases such as this is whether the probation officer had a reasonable suspicion of criminal activity or a violation of probation prior to the…search." *In re J.E.*, 907 A.2d 1114, 1119 (Pa.Super. 2006), *aff'd*, 594 Pa. 528, 937 A.2d 421 (2007) (emphasis omitted). Accordingly, the fact that a probationer signs a consent form permitting warrantless searches as a term of his probation is insufficient to permit a search absent reasonable suspicion of wrongdoing. *Id.* at 1120. Rather, the probationer's signature acts as acknowledgment that the probation officer "has a right to conduct reasonable searches of [the probationer's] residence listed on the [probation] agreement without a warrant." *Commonwealth v. E. Williams*, 547 Pa. 577, 588, 692 A.2d 1031, 1036 (1997).

In *Smith, supra*, the appellant/parolee signed a form after his release from prison entitled "Conditions Governing Parole/Reparole," which expressly permitted agents of the Pennsylvania Board of Probation and Parole to

search the appellant's person, property, and residence without a warrant. The appellant resided with his girlfriend, who also consented to unannounced home visits by parole agents and warrantless searches based on reasonable suspicion that the appellant has violated the conditions of his parole. Parole agents visited the appellant's residence for a routine "house check," and during a "walk through" of the residence, one agent detected a strong odor of marijuana emanating from the basement. The agent descended the basement stairs and located in a shopping bag under the stairs a large quantity of marijuana, cash, a scale, unused baggies, and a picture of the appellant. A subsequent police search of the residence revealed one and three-quarter pounds of suspected marijuana, two boxes of live ammunition, a digital scale, a picture of the appellant, and cash. The Commonwealth charged the appellant with PWID, after which he sought to suppress the evidence, claiming the parole officers' visit to his residence constituted a search without reasonable suspicion. The trial court denied the motion. Following a jury trial conviction for PWID, the appellant challenged the trial court's suppression ruling on appeal.

This Court affirmed the suppression court's decision, reasoning:

> We conclude that the state parole agent's actions in walking through [the a]ppellant's residence did not constitute a search. Rather, the parole agents were performing their supervisory duties by visiting [the a]ppellant at his home to ensure his compliance with the conditions of his probation. The visit, which did not progress beyond a visual inspection, was limited in its scope and intrusiveness. The record indicates that the

- 19 -

> walk-through was of short duration, occurring between 10:10 p.m. and 10:25 p.m. Additionally, the record does not indicate that the parole agents did anything more than walk through the various rooms checking for anything in plain sight.
>
> During this lawful visit, Agent Peterson smelled marijuana emanating from [the a]ppellant's basement, and at that juncture, he developed the requisite reasonable suspicion to conduct a search for the marijuana. Notably, the "plain view" doctrine renders a search and seizure permissible where: (1) the government officials have not violated the Fourth Amendment in arriving at the location from which the item could be viewed; (2) the item is in plain view; (3) the incriminating character of the item is immediately apparent; and (4) the government officials have a lawful right of access to the item itself. Given that the parole agents were visiting [the a]ppellant at his residence in accordance with their supervisory duties, the smell of marijuana gave rise to reasonable suspicion for the agents to conduct a search for the contraband that was ultimately located in the basement. Accordingly, we find no error in the trial court's denial of [the a]ppellant's motion to suppress the evidence obtained from [the a]ppellant's residence.

*Smith, supra* at 537 (internal citations, quotation marks, and footnote omitted). *See also Commonwealth v. Curry*, 900 A.2d 390, 395 (Pa.Super. 2006) (reversing trial court's grant of defendant/parolee's motion to suppress and remanding for further proceedings; parole agents had warrant for parolee's arrest for failure to report for supervision, visited apartment where agents believed parolee was hiding, discovered parolee hiding in bathroom, and observed drug paraphernalia in plain view; "[t]his observation clearly gave [the parole supervisor] reasonable suspicion to believe that the property in the possession of or under the control of [the

parolee] contained contraband or other evidence of violations of the conditions of supervision"; based on that reasonable suspicion, parole supervisor searched bureau that stood near contraband and immediately discovered ammunition and firearm; in sum, parole supervisor possessed reasonable suspicion to conduct search of residence in which parolee was staying because supervisor observed, in plain view, evidence that parolee was engaged in criminal activity inside apartment; suppression of evidence was improper) (internal citation and quotation marks omitted).

Under the "stalking horse" doctrine, Pennsylvania courts historically invalidated probation officers' searches and subsequent seizures of evidence where the probation officers essentially "switched hats," and, in all relevant respects, became police officers. *Commonwealth v. Altadonna*, 817 A.2d 1145 (Pa.Super. 2003). Although most cases in our jurisdiction analyzing the "stalking horse" doctrine predated Section 9912 and its predecessor statute, the doctrine is still "pertinent" to the extent a probation officer aids the police by statutorily circumventing the warrant requirement, based on reasonable suspicion, instead of the heightened standard of probable cause.[6]

_____

[6] Our federal courts have described the "stalking horse" doctrine as follows:

> A probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers. However, collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is

*(Footnote Continued Next Page)*

*See Altadonna, supra* at 1152-53. *See also Commonwealth v. Brown*, 361 A.2d 846, 850 (Pa.Super. 1976) (holding parole officer was acting as stalking horse for police where appellant's parole officer arrived at appellant's home along with two police officers and appellant's employer, without arrest or search warrant, based on suspicion that appellant had stolen electronic goods from his employer; parole officer had asked police to assist him in arresting appellant; upon entrance into appellant's residence, appellant's employer immediately recognized stolen goods; parole officer then arrested appellant; in this scenario, parole officer ceased acting as administrator of parole system and "switched hats" to become police officer, involving appellant's employer who wanted to press criminal charges and requesting assistance of other police officers; once parole officer "switched hats" and, in all relevant respects, became police officer, administrative justification that generally permitted parole officer to avoid acquisition of

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

> whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives. **A probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer.**
>
> In a more succinct articulation of the same view, … a [probation] search may be invalidated when it is nothing more than a ruse for a police investigation.

*United States v. S. Williams*, 417 F.3d 373, 377 (3d Cir. 2005) (internal citations and quotation marks omitted) (emphasis added).

warrant was no longer applicable). ***Compare Altadonna, supra*** (holding parole officers were not acting as stalking horses for Bureau of Narcotics Investigation ("BNI"), where parole officers had received information that appellant was dealing drugs and directed another parolee to arrange meeting with appellant; when appellant arrived at agreed-upon time and place of meeting, parole officers seized appellant and searched van in which he was sitting; although BNI agents assisted parole officers in seizure of appellant and search of van, witnesses testified consistently at suppression hearing that stop and search of appellant took place to determine whether appellant had violated his parole, and parole officers requested assistance from BNI solely due to possible jurisdictional uncertainty that might occur during investigation).

Instantly, Appellee was serving a two-year probationary sentence for fleeing or attempting to elude a police officer. Appellee reviewed and signed probation Regulations, which allowed probation officers to visit Appellee's residence at any time to confirm compliance with the terms and conditions of his probation. The Regulations expressly prohibited Appellee from possessing contraband, such as drug paraphernalia, firearms, or any non-prescribed controlled substances. By signing the Regulations, Appellee also acknowledged that the probation officers could search his property at any time, based upon reasonable suspicion that Appellee was in possession of contraband. (***See*** Regulations at 1 ¶¶ 2, 6.)

On February 12, 2015, several probation officers from the SIU visited Appellee's residence to verify his compliance with the terms and conditions of his probation. Upon entering the residence, the probation officers immediately observed, in plain view, clear, empty, corner-cut baggies, cigar packages, and small rubber bands. They also saw, in plain view, a shotgun in an open closet in the kitchen. When the probation officers walked through the residence and entered Appellee's bedroom, they noticed, in plain view, a box of nine-millimeter rounds on the floor and clear, empty baggies, cash, and a digital scale in a half-open dresser drawer. Additionally, the probation officers observed some type of attachment to a device used to smoke marijuana, which had liquid dripping from it. The probation officers also observed several prohibited knives. Appellee's possession of each of these items constituted a violation of his probation, so the probation officers placed Appellee in handcuffs. (*See id.*)

Agent Schauren called his deputy director, who gave the probation officers permission to search the residence because the items they had observed in plain view gave rise to reasonable suspicion to support the search. Agent Schauren then called Detective Burkhart of the DTF, who agreed to send DTF agents to Appellee's residence. Upon their arrival, the probation officers asked the DTF agents if they were interested in pursuing charges. After some discussion, the DTF agents decided not to pursue a search warrant or criminal charges against Appellee. When Appellee was

removed from the residence, the remaining probation officers executed the approved search of Appellee's residence. The probation officers opened a refrigerator in Appellee's bedroom and discovered a controlled substance which tested positive for cocaine. At that point, Agent Schauren placed a second call to Detective Burkhart, who sent two DTF agents back to Appellee's residence. When the DTF agents arrived, they observed the cocaine and filed a criminal complaint against Appellee for PWID and possession of drug paraphernalia.

In granting Appellee's motion to suppress the cocaine, the trial court summarized its reasoning as follows:

> [T]he [c]ourt found that the [p]robation [o]fficers' searching of the refrigerator in [Appellee's] bedroom was improper. This is because the refrigerator was searched after the probation officers had already: (1) Searched the residence and found evidence of probation violations; (2) Arrested and removed [Appellee] from the residence based on those violations; (3) Called the [DTF] to the residence; and (4) Were told by the [DTF] that there was insufficient evidence to support new criminal charges. The [c]ourt posits that continuing to search the residence after these events had occurred was excessive.

(Trial Court Opinion, filed March 29, 2016, at 1; R.R. at 32a). We respectfully disagree with the trial court's analysis under the facts of this case.

Initially, the trial court erred when it said the probation officers' first walk-through of Appellee's residence constituted a "search." Here, Appellee signed Regulations allowing for unannounced home visits to verify his

- 25 -

compliance with the terms and conditions of his probation. When the probation officers entered Appellee's residence, the purpose of their presence was to verify his compliance with the Regulations. The probation officers then took a "tour" of the home, making only a visual inspection of Appellee's residence. Nothing in the record supports Appellee's statements that the probation officers "forced" or "pushed their way inside [Appellee's] residence without invitation" or that the probation officers' entry was akin to a "raid." (*See* Appellee's Brief at 3, 14, 15.) Rather, the record confirms the probation officers performed an unannounced home visit as set forth in the Regulations. (*See* Regulations at 1 ¶ 2.) *See also Smith, supra*.

During the course of the home visit, the probation officers saw, in plain view, various items which the officers immediately recognized as drug paraphernalia as well as a shotgun in the open kitchen closet. The probation officers saw other evidence of drug paraphernalia in Appellee's bedroom, ammunition and several prohibited knives. These observations gave the probation officers reasonable suspicion to believe Appellee had other contraband in the residence. The officers' search (conducted with proper prior approval) was consistent with and reasonably related to their supervisory duties to confirm whether Appellee possessed drugs or weapons in violation of the Regulations. *See* 42 Pa.C.S.A. § 9912; *Smith, supra*; *Curry, supra*. The probation officers' search was not illegal simply because the drug paraphernalia and other items situated in plain view constituted

separate probation violations or because the search occurred after the DTF agents left the premises. Contrary to Appellee's arguments, many types of physical evidence seen during a home visit would constitute probation violations on their own as well as give rise to reasonable suspicion to perform a further search. Likewise, the search was not unlawful merely because it revealed incriminating evidence for use in a criminal prosecution. *See E. Williams, supra* at 590 n.11, 692 A.2d at 1037 n.11 (explaining search is not unlawful simply because it also benefits police or that incriminating evidence found is turned over to police for use in criminal prosecution).

Additionally, the fact that DTF agents originally decided to pass on pursuing a search warrant or criminal charges, based on the evidence found in plain view, does not nullify the probation officers' reasonable suspicion to conduct a thorough search.[7] Significantly, Agent Schauren testified that contacting the local police is "standard predicate" in these circumstances; and there was no prior arrangement with the DTF regarding Appellee's residence. Detective Kelly confirmed he had no interaction with anyone

---

[7] Similarly, Appellee's transport to the APPS' office prior to the search and the CCA's stated intent to condemn Appellee's residence does not nullify the probation officers' reasonable suspicion to search. Even if Appellee were physically unable to return to his residence (which we cannot say with certainty on this record), the probation officers still had reasonable suspicion to believe Appellee had contraband in the residence. *See* 42 Pa.C.S.A. § 9912; *Smith, supra*; *Curry, supra*.

from the probation office before Detective Burkhart dispatched him to Appellee's residence. Thus, the record lacks any evidence of an express or tacit agreement between the probation officers and the DTF in this case to support Appellee's "stalking horse" claims.[8] *See Altadonna, supra*; *S. Williams, supra*. *Compare Brown, supra*.

Based upon the foregoing, we conclude the probation officers in this case first conducted an unannounced "home visit" of Appellee's residence, in accordance with Appellee's probation Regulations. Their observations of contraband in plain view gave them reasonable suspicion that Appellee had additional contraband in the residence. The probation officers' search, which was conducted with prior approval, was consistent with and reasonably related to Appellee's probation Regulations. Therefore, the probation officers' search of Appellee's residence was proper under the facts of this

_____

[8] Federal jurisprudence has called into question the continued vitality of the "stalking horse" doctrine. *See United States v. Knights*, 534 U.S. 112, 122, 122 S.Ct. 587, 593, 151 L.Ed.2d 497, ___ (2001) (holding search of probationer's home is constitutional so long as probation officer has reasonable suspicion that probationer who is subject to search condition in probation agreement is engaged in criminal activity; "Because our holding rests on ordinary Fourth Amendment analysis that considers all the circumstances of a search, there is no basis for examining official purpose"); *S. Williams, supra* (explaining "stalking horse" claims are necessarily premised on some notion of impermissible purpose, but *Knights* decided that inquiries into purpose underlying probationary searches are impermissible). *See also Commonwealth v. Hughes*, 575 Pa. 447, 836 A.2d 893 (2003) (reaffirming that Pennsylvania Constitution provides parolee with no greater protection than United States Constitution in area of warrantless searches of parolee's residence, where parolee has signed agreement to allow search of his premises as condition of parole).

case, and the trial court erred when it suppressed the cocaine uncovered during the valid search. **See Goldsborough, supra**. Accordingly, we affirm the trial court's denial of suppression of the evidence observed in plain view, reverse the trial court's suppression of the cocaine, and remand for further proceedings.

Order affirmed in part and reversed in part; case remanded for further proceedings. Jurisdiction is relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/12/2016</u>