J-A24003-25

2025 PA Super 232

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                      :             PENNSYLVANIA
                                        :

v.                          :
                                        :

TERRY LYNDELL STONEY          :
                                        :

          Appellant          :     No. 1668 MDA 2024

Appeal from the Judgment of Sentence Entered October 21, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0002173-2022

BEFORE: DUBOW, J., KUNSELMAN, J., and BECK, J.

OPINION BY BECK, J.:                      **FILED: OCTOBER 10, 2025**

Terry Lyndell Stoney ("Stoney") appeals from the judgment of sentence

entered by the Dauphin County Court of Common Pleas ("suppression court")

after a jury convicted him of persons not to possess firearms, carrying a

firearm without a license, and disorderly conduct – creating a hazardous or

physically offensive condition.[1] Stoney challenges the suppression court's

denial of his motion to suppress the evidence police obtained during his

investigatory detention. Because we conclude that the suppression court did

not err, we affirm.

The suppression court aptly summarized the evidence the

Commonwealth presented at the hearing on Stoney's suppression motion and

the procedural history of this case as follows:

---

[1] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), 5503(a)(4).

On May 9, 2022, at approximately 4:00 P.M., Officer Jeremy Crist (hereinafter "Officer Crist") of the Harrisburg Police Department was working as a member of the Street Crimes Unit. He was partnered with Dauphin County Adult Probation Officers ("APO") Dan Kinsinger, Jed Robbins, and Cale Hoover. As Officer Crist was driving, he observed two males standing on the Southwest corner of North 6th and Seneca Streets, which Officer Crist described as a high-crime, high-drug area. These males were later identified as [Stoney] and Dupree Holmes.

According to Officer Crist, he observed that Holmes had a very large heavy object in the front middle area of his body, which Officer Crist believed was a firearm with a drum magazine. While watching these males, Officer Crist saw [Stoney] use his right hand to "tap" an object in his front waistband, which Officer Crist believed was consistent with someone who was carrying a concealed firearm in the waistband. After driving around the block, Officer Crist turned his vehicle onto the 500 block of Curtin Street and parked. All the officers exited the vehicle and began walking towards the men from the rear, when Officer Crist said "Hey fellas," [Stoney] and Holmes turned, observed the officers, and fled. Officer Crist chased after Holmes in pursuit, and [Stoney] was pursued by APO[]s Robbins and Kinsinger. Officer Crist had a leg injury at the time of the incident, so he was unable to run at full capacity and requested the other officers to assist him in stopping [Stoney].

APO Kinsinger pursued [Stoney], and during the ensuing chase[,] observed [Stoney] allegedly pull out a firearm from his waistband and throw it onto a roof. APO Kinsinger knew [Stoney] had previously been convicted of a felony drug offense and was ineligible to possess a firearm, since APO Kinsinger previously supervised him on Dauphin County Probation. Ultimately, both [Stoney] and Holmes were arrested after brief chases.

Suppression Court Opinion, 11/21/2022, at 2-3 (unnecessary capitalization omitted).

… On July 29, 2022, [Stoney] filed an omnibus pretrial motion to suppress. A suppression hearing was initially scheduled for September 29, 2022, but was ultimately held on October 18, 2022. At the conclusion of the hearing, [the suppression court] afforded both parties an opportunity to submit post-hearing briefs.

[Stoney] filed his memorandum of law on October 20, 2022, and the Commonwealth filed its response on October 27, 2022. …

*Id.* at 1-2 (unnecessary capitalization omitted).

On November 21, 2022, the suppression court denied Stoney's suppression motion. On August 18, 2024, following trial, a jury convicted Stoney of the above-referenced crimes. The judge sentenced Stoney to an aggregate term of 80 to 160 months in prison and on October 21, 2024, issued an amended judgment of sentence to award Stoney credit for time served. This timely appeal followed. Stoney presents the following issues for review:

> A. Did the suppression court err in determining that there was reasonable suspicion to support the seizure of [Stoney], such that his abandonment of the firearm was not "forced?"
>
> B. Did the suppression court err when it sanctioned the seizure of [Stoney] by county probation officers when their statutory authority was limited to supervising county probationers and parolees, [Stoney] was not on county supervision, and police [sic] acted as effectively police officers in seizing him?

Stoney's Brief at 4 (unnecessary capitalization omitted).

Our standard of review for the denial of a suppression motion is well settled:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The

- 3 -

suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre[]trial motion to suppress.

*Commonwealth v. Carey*, 249 A.3d 1217, 1223 (Pa. Super. 2021) (citation omitted).

In his first issue, Stoney argues that the suppression court erred in denying his suppression motion because the officers lacked reasonable suspicion to stop and detain him. *See* Stoney's Brief at 11-24. Stoney asserts that he was seized at the point when Officer Crist called out, "hey fellas," and that his actions did not constitute unprovoked flight because he was already moving in the opposite direction from which the officers were approaching in their vehicle. *See id.* at 19-20. He contends that his flight began slightly after the officers began to pursue him. *Id.* at 21. Stoney maintains that this was not a "case of [him] seeing officers and immediately running. It was a reaction to seeing officers pass by, return to his location and, in a group of three, attempt to speak with him and [Holmes]." *Id.* at 21-22. Stoney claims it was Holmes that immediately ran and that he only fled after the officers engaged him. *Id.* at 22.

"Both the Fourth Amendment [to] the United States Constitution and Article [I], Section 8 of the Pennsylvania Constitution guarantee individuals freedom from unreasonable searches and seizures." *Commonwealth v.*

*Duke*, 208 A.3d 465, 470 (Pa. Super. 2019) (citation and quotation marks omitted). "A warrantless search or seizure is presumptively unreasonable under the Fourth Amendment and Article I, § 8, subject to a few specifically established, well-delineated exceptions." *Commonwealth v. Smith*, 285 A.3d 328, 332 (Pa. Super. 2022) (quotation marks and citation omitted). "Exceptions to the warrant requirement include the consent exception, the plain view exception, the inventory search exception, the exigent circumstances exception, the automobile exception …, the stop and frisk exception, and the search incident to arrest exception." *Commonwealth v. Simonson*, 148 A.3d 792, 797 (Pa. Super. 2016) (quotation marks and citation omitted). This case implicates the stop and frisk exception to the warrant requirement.

"Not every encounter between a law enforcement officer and a citizen constitutes a seizure warranting constitutional protections. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Commonwealth v. Adams*, 205 A.3d 1195, 1199 (Pa. 2019) (quotation marks and citations omitted).

> We have long recognized three types of interactions that occur between law enforcement and private citizens. The first is a mere encounter, sometimes referred to as a consensual encounter, which does not require the officer to have any suspicion that the citizen is or has been engaged in criminal activity. This interaction also does not compel the citizen to stop or respond to the officer. A mere encounter does not constitute a seizure, as the citizen is free to choose whether to engage with the officer and comply with

any requests made or, conversely, to ignore the officer and continue on his or her way. The second type of interaction, an investigative detention, is a temporary detention of a citizen. This interaction constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot. The third, a custodial detention, is the functional equivalent of an arrest and must be supported by probable cause. A custodial detention also constitutes a seizure.

*Id.* at 1199-1200 (citations omitted).

"No bright lines separate these types of encounters, … but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter." *Id.* at 1200 (citation omitted). "The test, often referred to as the 'free to leave test,' requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Id.* (quotation marks and citation omitted). Whenever a police officer confronts an individual "and restrains his freedom to walk away, he has 'seized' that person." *Id.* (citation omitted).

An investigative detention, or *Terry*[2] stop, "occurs when a police officer temporarily detains an individual by means of physical force or a show of authority for investigative purposes." *Commonwealth v. Barnes*, 296 A.3d 52, 60 (Pa. Super. 2023) (quotation marks and citation omitted). As stated

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

above, an investigative detention "constitutes a seizure of a person, and to be constitutionally valid police must have a reasonable suspicion that criminal activity is afoot." *Adams*, 205 A.3d at 1200. The following two conditions must be present for a valid stop and frisk:

> First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter … where the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person is armed and dangerous.

*Interest of T.W.*, 261 A.3d 409, 417 (Pa. 2021) (citation omitted).

A reasonable suspicion analysis considers the totality of the circumstances. *Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004). "[A]n investigative detention is constitutionally permissible if an officer identifies "specific and articulable facts" that led the officer to believe that criminal activity was afoot, considered in light of the officer's training and experience." *Adams*, 205 A.3d at 1205. The test is not limited to facts that clearly indicate criminal conduct. *Rogers*, 849 A.2d at 1189. "Rather, [e]ven a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Id.* (citations omitted).

In denying Stoney's suppression motion, the suppression court explained:

> In the instant case, Officer Crist testified that the area in question was a high-crime, high-drug area. They also had observed Holmes with a large bulky item in his shirt, which he believed was a firearm with a drum magazine based upon his special training. When [Stoney] began fleeing, he was grabbing his waistband as

- 7 -

he ran, confirming Officer Crist's belief that [Stoney] had a concealed firearm. Based on APO Kinsinger's knowledge of [Stoney]'s prior conviction, they were aware that [Stoney] could not legally possess a firearm. [Stoney]'s unprovoked flight in a high-crime area as well as the Officer's belief that he possessed a firearm established a reasonable suspicion that criminal activity was afoot. Accordingly, [the suppression court found] that the seizure of [Stoney] was supported by reasonable suspicion.

Suppression Court Opinion, 11/21/2022, at 6.

The record reflects that Officer Crist and the APOs were patrolling the North 6th and Seneca Streets area of Harrisburg, a "high-drug, high-crime" area that is particularly known to contain a significant amount of gun and violent crime. N.T., 9/29/2022, at 10-11. As they were driving through the area, Officer Crist saw Stoney and Holmes standing on the Southwest corner of North 6th and Seneca Streets. *Id.* at 11. Officer Crist testified that he observed that Holmes had an unusually large bulge in the front part of his waistband and that he looked like he was attempting to support a large object. *Id.* at 12. Officer Crist indicated that based on his twelve years of experience as a police officer that he believed Holmes was concealing a firearm with a large, extended magazine. *Id.* The officer also observed Stoney touch the front of his waistband and perform what he referred to as a "security check," which Officer Crist stated was consistent with concealing a firearm in that area of clothing. *Id.* at 13. APO Kinsinger testified that he informed the other officers that he was familiar with Stoney and that he knew Stoney was on federal supervision and thus not permitted to possess a firearm. *Id.* at 31.

As the two men moved to the 500 block of Curtin Street, Officer Crist circled the block and pulled his vehicle approximately a block behind where Stoney and Holmes were walking. *Id.* As Officer Crist and the APOs exited their vehicle and approached Stoney and Holmes, Officer Crist testified that he said "something to the effect of [`]Hey, fellas,[']or [`]Hey, guys.[']" *Id.* at 15. Both Stoney and Holmes looked backed at the officers, and according to APO Kinsinger, appeared surprised to see them. *Id.* at 32. Officer Crist stated that both Stoney and Holmes then immediately fled in opposite directions. *Id.* at 15-16, 32. As Officer Crist had recently suffered a leg injury, he requested that the APOs help him pursue the now-fleeing suspects. *Id.* at 17. APO Kinsinger testified that as he pursued Stoney, he observed him remove a firearm from his waistband and throw it on top of a residence. *Id.* at 33. APO Kinsinger then apprehended Stoney, and with the assistance of the fire department, the APOs recovered the firearm from the roof of the residence shortly after the pursuit. *Id.* at 33-35.

As stated above, the "free to leave test" requires consideration all the circumstances to determine whether a police officer's conduct "would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Adams*, 205 A.3d at 1200. (quotation marks and citation omitted). This Court has further explained:

> A variety of factors may influence this determination, including the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance

with the officer's request might be compelled. As our High Court has explained, subtle factors as the demeanor of the police officer, the location of the confrontation, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements must be considered.

***Commonwealth v. Luczki***, 212 A.3d 530, 543 (Pa. Super. 2019) (citation omitted). "[T]he circumstances must present some level of coercion, beyond the officer's mere employment, that conveys a demand for compliance or threat of tangible consequences from refusal." ***Id.*** at 544 (citation omitted).

Based upon our review of the record and the applicable authority, we conclude that Officer Crist calling out "hey, fellas" to Stoney and Holmes did not amount to a seizure for Fourth Amendment purposes, as it did not amount to a forceful authoritative command that would cause a reasonable person to believe they were not free to leave, and thus, at that point, the interaction was nothing more than a mere encounter. ***See Adams***, 205 A.3d at 1200; ***Luczki***, 212 A.3d at 543-44. Instead, Stoney and Holmes were seized for Fourth Amendment purposes when they fled and the officers began to pursue them. ***See Commonwealth v. Taggart***, 997 A.2d 1189, 1192 (Pa. Super. 2010) (explaining that "well-settled Pennsylvania precedent establishes that a police officer's pursuit of a fleeing suspect constitutes a seizure"). The record reveals that at the time, Stoney and Holmes were in a high-crime area, Officer Crist suspected both Stoney and Holmes were in possession of firearms, that Stoney was doing so illegally, and that Stoney and Holmes engaged in unprovoked flight from police. ***See In re D.M.***, 781 A.2d 1161,

1164 (Pa. 2001) ("unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a **Terry** stop under the Fourth Amendment").

Although Stoney asserts that his flight and the officers' pursuit occurred simultaneously, testimony from Officer Crist and APO Kinsinger indicated that Stoney and Holmes fled immediately once they saw the officers after Officer Crist called out "hey, fellas" to them. **See** N.T., 9/29/2022, at 15, 32. The suppression court credited this testimony, and we are bound by that determination. **See Carey**, 249 A.3d at 1223; **see also** Suppression Court Opinion, 11/21/2022, at 6.

We conclude that the record supports the suppression court's determination that, based on the totality of the circumstances, Officer Crist had reasonable suspicion to stop and detain Stoney. Stoney's first issue therefore does not entitle him to relief.

In his second issue, Stoney argues that the APOs acted outside their statutory authority when they pursued and seized him. Stoney's Brief at 24-33. He asserts that probation officers do not possess police power over individuals that are not subject to their authority, i.e., that are not under the supervision of county probation. **Id.** at 25. Stoney contends that because he was not on county probation, the APOs lacked the authority to pursue and seize him, and thus were improperly acting as police officers instead of probation officers. **Id.** at 26-33.

In support of his claim, Stoney cites **Commonwealth v. Mathis**, 173 A.3d 699 (Pa. 2017). **See** Stoney's Brief at 26-28. In **Mathis**, Pennsylvania Board of Probation and Parole agents conducted a routine home visit of Gary Waters, a parolee. **Mathis**, 173 A.3d at 702. Upon entering the residence, the agents immediately smelled marijuana and observed Mathis sitting in a chair in the kitchen area. **Id.** One of the agents detained Waters and questioned him about the marijuana while the other agent continued to watch Mathis, who "repeatedly got up from the chair and walked to the kitchen counter, apparently checking text messages on his charging cellphone." **Id.** According to the agents, Mathis appeared nervous, and they asked him to refrain from using the cellphone for safety reasons. **Id.**

At one point, one of the agents noticed that Mathis placed his hands underneath his jacket. **Id.** at 703. As Mathis began walking, the agent observed a bulge in the jacket and became concerned for everyone's safety and "asked [Mathis] if he could pat him down for safety reasons[.]" **Id.** Mathis refused, and consequently, the agent reached out and felt the bulge. **Id.** Believing the bulge to be a firearm, the agent grabbed the jacket and threw it on the ground. **Id.** The agents then recovered a firearm and arrested Mathis. **Id.**

On appeal, our Supreme Court observed that "the Parole Code imposes a number of duties upon agents, including supervision of offenders in a manner that will assist in their 'rehabilitation and reassimilation into the

community and … protect the public.'" **Id.** at 708 (quoting 61 Pa.C.S. § 6153(a)).[3] The Parole Code also "declares agents to be peace officers and provides them with police power to arrest without warrant any parolee under supervision for violating parole conditions." **Id.** at 701-02 (quoting 61 Pa.C.S. § 6152).[4]

The Supreme Court explained "that the plain language … does not otherwise reveal a legislative intent to empower parole agents to act as police officers with respect to non-offenders or private citizens." **Id.** at 708 (quotation marks and citation omitted). It nonetheless authorizes parole agents "to undertake constitutionally permissive actions that may preempt resort to the use of deadly force." **Id.** at 710. The **Mathis** Court identified this power as "ancillary authority" flowing from the statutory directive to supervise offenders and assist in their rehabilitation; "in order to satisfy these statutory duties, parole agents, among other things, conduct routine, unannounced home visits, as in this case, thus risking exposure to a variety of potentially dangerous unknowns." **Id.** at 708. The Supreme Court stated that parole agents "are statutorily empowered to employ deadly force for self-protection or protection of another and in the course of making an arrest," and "are sanctioned to carry firearms in performing their duties." **Id.** It

---

[3] That statute was repealed in 2021 and is now codified at 61 Pa.C.S. § 6182.

[4] This statute is now codified at 61 Pa.C.S. § 6181.

- 13 -

recognized that it would be "anomalous to hold that parole officers may carry weapons like peace officers, place themselves in peril like peace officers, and conduct lawful arrests like peace officers, yet not protect themselves in the face of apparent danger." *Id.* at 710 (citation omitted).

Recently, this Court examined the *Mathis* Court's rationale as applied to probation officers:

> [W]e observe that the General Assembly treats county probation officers virtually the same as state parole agents in terms of statutory authorization over supervisees. Like parole officers, probation officers are charged with assisting offenders with their rehabilitation, reassimilation into the community, as well as protecting the public. *See* 42 Pa.C.S. § 9912(a). Probation officers further "shall have police powers and authority throughout this Commonwealth to arrest, with or without warrant, writ, rule or process, any person on probation … for failing to report as required by the terms of that person's probation … or for any other violation of that person's probation[.]" *Id.* § 9913. The General Assembly has also authorized probation officers to carry firearms, creating a mandatory firearms training program for those who carry a firearm. 61 Pa.C.S. § 6306. Moreover, in discharging their duties, probation agents, like parole officers, will inevitably encounter ordinary citizens, as occurred here. *See Mathis*, 173 A.3d at 709 (noting that "interactions with non-offenders are inherent in parole enforcement activities").

> Based upon the similarity of the statutory sources governing their supervisory duties as well as the statutory authority granted to them to arrest their supervisees and carry firearms, and the concomitant safety risks that may arise in the course of discharging those duties, we conclude that the *Mathis* holding extends to probation agents.

*Commonwealth v. Gibson*, 333 A.3d 710, 717 (Pa. Super. 2025)

Stoney asserts that his case differs from *Mathis* because he was not under county supervision, and thus the APOs patrolling with Officer Crist did

not have the authority to pursue him or detain him and were therefore improperly acting as police officers. Stoney's Brief at 28-29. As such, he contends that the APOs, who ultimately physically apprehended him, violated the "stalking horse" doctrine. *Id.* at 29.

> With respect to the stalking horse doctrine, this Court has explained:
>
> > Under the "stalking horse" doctrine, Pennsylvania courts historically invalidated probation officers' searches and subsequent seizures of evidence where the probation officers essentially "switched hats," and, in all relevant respects, became police officers. Although most cases in our jurisdiction analyzing the "stalking horse" doctrine predated [s]ection 9912 and its predecessor statute, the doctrine is still "pertinent" to the extent a probation officer aids the police by statutorily circumventing the warrant requirement, based on reasonable suspicion, instead of the heightened standard of probable cause.

*Commonwealth v. Parker*, 152 A.3d 309, 320 (Pa. Super. 2016) (citation omitted).

In this case, there is nothing in the record that supports Stoney's claim that the APOs were acting as "stalking horses." As stated above, the record reflects that Stoney was seized for Fourth Amendment purposes when Officer Crist and the APOs began their pursuit of Stoney and Holmes after they fled. *See Taggart*, 997 A.2d at 1192. Thus, the APOs were not using their position as probation officers to aid Officer Crist in circumventing any type of Fourth Amendment protection—Officer Crist already possessed reasonable suspicion to stop and detain Stoney and Holmes. Stoney points to no authority that stands for the proposition that a probation officer cannot aid a police officer in physically apprehending a fleeing suspect when the police officer possesses

reasonable suspicion to detain the individual and is unable to do so himself. Thus, we conclude that the stalking horse doctrine is inapplicable to this case. Stoney's second issue is meritless.

Officer Crist had reasonable suspicion to stop and detain Stoney and the APOs did not violate any law in assisting Officer Crist in apprehending Stoney. As such, the suppression did not err in denying Stoney's suppression motion.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/10/2025